## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| DESRI JONES, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) **CIVIL ACTION NO.: 4:24-cv-02105** |
| v. | ) |
| | ) |
| MEMORIAL HERMANN HEALTH | ) |
| SYSTEM, et al., | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs, Desri Jones, Janet Fleming, Sanda Moody, and Tiffani Benoit, ("Plaintiffs"), respectfully submit this opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, ECF No. 25 (hereinafter "MTD"). Defendants' arguments are meritless because Plaintiffs have plausibly alleged sufficient facts supporting their breach of fiduciary duty claims brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, particularly the allegations pertaining to the Plan's[1] excessive recordkeeping and administration ("RKA") fees, underperforming investments, and the derivative duty to monitor claim.[2] *See* First Amended Complaint, ECF No. 18 ("FAC"). However, Plaintiffs are also attaching a Proposed Second Amended Complaint ("PSAC") and, to the extent necessary, seek leave to amend their complaint, solely to resolve the issues in the FAC's charts showing investment performance and rankings. *See* Ex. A; *see also* Ex. B (Redlined PSAC).

## I.    INTRODUCTION

Defendants' Motion to Dismiss misses the mark on the facts and the law. Defendants' arguments are rife with mischaracterizations of Plaintiffs' allegations and are supported by

---

[1] The Plan refers to the Memorial Hermann Health System Employees' Retirement Savings Plan.

[2] "Defendants" are defined in the MTD. *See* MTD at 1.

distinguishable out-of-Circuit caselaw. Defendants also attach an improper exhibit. Nonetheless, the FAC plausibly alleges that Defendants breached their fiduciary duties owed to the Plan and its participants as it relates to the Plan's excessive RKA fees, especially under the precedent set forth in *Perkins v. United Surgical Partners Int'l, Inc*., No. 23-cv-10375, 2024 WL 1574342 (5th Cir. Apr. 11, 2024) (brought by the instant Plaintiffs' Counsel) and *Hughes v. Nw. Univ.*, 142 S. Ct. 737 (2022) ("*Hughes I*"). Plaintiffs also plausibly allege that Defendants had imprudent processes regarding the underperforming JPMorgan SmartRetirement Series Target Date Funds ("JPMorgan TDFs"). While Plaintiffs invested in the R6 Share Classes of the JPMorgan TDFs, the FAC's charts showing the material and persistent underperformance of the A-Share Class are still sufficient to show Defendants' imprudence in selecting and retaining the R6-Share Class, because all "share classes" within a TDF series are identical except for investment fees. *See Hughes I*, 142 S. Ct. at 741 (different share classes are "cheaper and otherwise-identical alternative investments"); *Tibble v. Edison Int'l*, 575 U.S. 523, 526 (2015) (same); *Perkins*, 2024 WL 1574342, at *3 (same); *Johnson v. Parker-Hannifin Corp*., No. 24-cv-3014, 2024 WL 4834717, at *3 (6th Cir. Nov. 20, 2024) (same). Accordingly, the PSAC shows consistent underperformance and poor rankings of the R6-Class while alleging the same comparators and the same period as the FAC. Plaintiffs conferred with Defendants about filing the PSAC, and Defendants stated that they oppose this request. For reasons detailed *infra*, Plaintiffs respectfully request that Defendants' Motion to Dismiss be denied, and/or in the alternative, Plaintiffs be granted leave to amend the FAC to resolve the narrow issue of the share class data in the performance charts.

## II.    STANDARD OF REVIEW IN BREACH OF FIDUCIARY DUTY ACTIONS

At this stage, "Plaintiffs' Amended Complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Perkins*, 2024 WL 1574342,

at *2 (citations omitted). "In determining whether fiduciaries have breached their duty of prudence, [the court] ask[s] whether the individual trustees, at the time they engaged in the challenged [actions], employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Blackmon v. Zachary Holdings, Inc*., No. 20-cv-988, 2021 WL 2190907, at *3 (W.D. Tex. Apr. 22, 2021 (quoting *Tatum v. RJR Pension Inv. Comm.*, 761 F. 3d 346, 356 (4th Cir. 2014)); *see also Bussian v. RJR Nabisco Inc.*, 223 F.3d 286, 299 (5th Cir. 2000). However, courts conduct this inquiry "after sufficient time for discovery" has occurred, *i.e.*, after the motion to dismiss stage. *Id*., at *6 (quoting *Sweda v. Univ. of Pa.*, 923 F.3d 320, 329 (3d Cir. 2019)). In ERISA cases, the "[f]ailure to allege facts that refer directly to the fiduciary's knowledge, processes, or investigation, however, is not fatal to a breach of fiduciary duty claim at the pleading stage if the court can reasonably infer from the plaintiff's pleadings that the defendant fiduciary's process was flawed" because "ERISA plaintiffs generally lack the inside information and details regarding a fiduciary's internal decision-making process at the pleading stage." *Seidner v. Kimberly-Clark Corp.,* No. 21-cv-867, 2023 WL 2728714, at *5 (N.D. Tex. Mar. 30, 2023) (citations omitted); *see also Main v. Am. Airlines Inc*., 248 F. Supp. 3d 786, 793 (N.D. Tex. 2017); *Johnson*, 2024 WL 4834717, at *9.

"A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Perkins,* 2024 WL 1574342, at *2 (quoting *Tibble*, 575 U.S. at 530). Also, "for [an excessive RKA fee] claim to survive dismissal, the Plaintiffs must have 'pleaded sufficient facts to render it plausible that [the Committee] incurred unreasonable recordkeeping fees and failed to take actions that would have reduced such fees.'" *Id*., at *4 (quoting *Hughes v. Nw. Univ*., 63 F.4th 615, 633 (7th Cir. 2023) (*Hughes II*)). Critically, the Supreme Court instructs that ERISA does not grant fiduciaries a "defense-friendly standard,"

meaning there is no "presumption of prudence" when ruling on a motion to dismiss. *Bancorp v. Dudenhoeffer*, 573 U.S. 409, 412 (2014) (internal citations omitted). Accordingly, "the 'difficult tradeoffs' that an ERISA fiduciary faces, and the 'range of reasonable judgments' that may be made" are "alternative explanations [that] need not be conclusively ruled out at the pleadings stage." *Hughes II*, 63 F.4th at 628; *see also Perkins*, 2024 WL 1574342, at *3; *Mator v. Wesco Distribution*, Inc., 102 F.4th 172, 189 (3d Cir. 2024).

## III.    STATEMENT OF FACTS

On October 18, 2022, Plaintiffs wrote to the Plan administrator to request, *inter alia*, any RKA agreements and the Committee's meeting minutes, which Defendants denied one month later. *See* FAC, ¶ 64. Although the specifics of Defendants' decision-making processes remain solely in their possession, Plaintiffs were able to draw reasonable inferences from several other sources, including publicly available information. *Id.*, ¶¶ 63, 66. Despite denying Plaintiffs' request for the Plan's RKA Agreement (the "Agreement") with its recordkeeper, Fidelity, Defendants improperly attached the Agreement to the MTD, but the Agreement does not disprove the FAC's allegations.

Throughout the Class Period, the Plan's size in terms of assets under management and number of participants categorize it as a "jumbo plan." *Id.*, ¶¶ 8-10. Less than 1% of 403(b) plans were the size of the Plan, resulting in the Plan having substantial bargaining power to obtain lower fees and better investments. *Id.* Memorial Hermann "directly or acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers." FAC, ¶ 25. Per the Plan's Investment Policy Statement ("IPS"), the Committee is responsible for selecting the Plan's investments and monitoring investment

4

performance against the appropriate benchmark, *i.e.*, "a widely known index of securities." FAC, ¶ 53, IPS at 5-13.

During the Class Period, the Plan's investments in the JPMorgan TDFs increased from $661,632,618.00 in 2018 to over $1.1 billion in 2022. *See* FAC, ¶ 84. The Committee was able to choose any of the marketplace's ample available target date series for the Plan. *Id.*, ¶¶ 84, 88-89. All share classes of the JPMorgan TDFs consistently and materially underperformed industry-accepted benchmarks for TDFs used by investment professionals as well as the Morningstar data in the Series' disclosures. *See* FAC, ¶¶ 74, 90; PSAC, ¶¶ 98-101. Hence, the FAC's "Comparator Funds" are appropriate because Morningstar places all five funds in the same category, and the Morningstar Lifetime Moderate Index is an appropriate "widely known index of securities" for benchmarking performance per the Plan's own documents. *See* FAC, ¶¶ 74, 91-95. Critically, the JPMorgan TDFs chronically underperformed both the Comparator Funds and its Benchmark well before the inception of the Class Period, and were therefore an imprudent series for the Plan. FAC, ¶¶ 98-101; PSAC, ¶¶ 98-101. By 2018, the start of the Class Period, the JPMorgan TDFs consistently underperformed the Comparator Funds and the Morningstar benchmark on a three-year and five-year basis. FAC, ¶¶ 102-03; PSAC, ¶¶ 102-03. This trend of underperformance continued throughout the Class Period, until the JPMorgan TDFs were belatedly removed in 2023. FAC, ¶¶ 104-06; PSAC, ¶¶ 104-06. Moreover, the JPMorgan TDFs continuously ranked poorly as compared to its Morningstar Category of peers. FAC, ¶ 107; PSAC, ¶ 107. This information was available at the start of the Class Period, and every year during the Class Period, particularly because Morningstar was the source of the TDFs' information per the Plan documents. *Id.*, ¶ 108. Each share class of the JPMorgan funds are identical except for price. *See Hughes I*, 142 S. Ct. at 741; *Tibble*, 575 U.S. 523, 526 (2015); *Perkins*, 2024 WL 1574342 *3. Different share classes

affect the amount of losses, but not liability nor the fact that there are losses. Thus, the PSAC and the FAC, using the same Comparators and same time period, demonstrate consistent dismal performance of the JPMorgan TDFs.

Defendants were also responsible for the Plan incurring RKA fees that were above reasonable rates. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's recordkeeper which can be provided to jumbo plans at very little cost. FAC, ¶¶ 127-28. There are essential services that are offered by all recordkeepers for one price regardless of the services chosen or used, partly because the recordkeeper's costs of using the technology do not change based on the Plan's size. *Id*., ¶¶ 129-31 (listing services). Plans with more participants can leverage economies of scale for lower "per-participant fees" because the recordkeeper allocates its fixed costs over a larger participant count. In short, RKA fees are driven by the number of plan participants. *Id*., ¶ 136.

Defendants' improperly attached Agreement shows that Fidelity provided services that fit squarely within the "recordkeeping services provided by all national recordkeepers for large plans" (FAC, ¶¶ 128-31), albeit the Agreement uses more detailed language than the "short and plain statement" required for the FAC. FED. R. CIV. P. 8. For example, Defendants list "government reporting, such as processing year-end tax reports" and "communication" services (MTD at 5), which are compulsory for all plans and listed in the FAC. *See* FAC, ¶ 129 (listing "Participant tax reporting[,]" "Participant confirmations, statements, and standard notices [,] […] phone, web" and "Plan-level reporting."). Recordkeepers provide these services because they are required by all large plans (FAC, ¶ 131), although Fidelity may promote them as an "additional" service. MTD at 5. In fact, a review of Fidelity's sample agreement confirms that Fidelity provides the same, standard services as all recordkeepers, but the Plan paid more than other plans. *Id*., ¶ 132. In 2022,

the Plan's per participant fee was at its lowest, $40. *See* FAC, ¶ 141. Memorial Hermann's 401(k) Plan was much smaller than the Plan in terms of both assets and participant size, but also paid $40 per participant. *Id.*, ¶¶ 142-43. Combined, the Plan and the Memorial Hermann 401(k) Plan had hundreds of thousands of dollars invested in Fidelity's investment products, with Fidelity collecting investment fees from these products every year. *Id.*, ¶¶ 55-59, 144.

The prevailing standard of prudence is to conduct a Request for Proposal ("RFP") at reasonable intervals, and immediately if a plan's RKA fees are higher than the marketplace. FAC, ¶¶ 146-47, 166-69. The Plan's fee history infers that an RFP was not conducted, or at least not prudently. *Id.*, ¶¶ 148-49, 152-54. Defendants also apparently failed to leverage the Plan's growing size and use of Fidelity's proprietary products – two commonly used sources of leverage – to obtain lower fees. *Id.*, ¶¶ 155-58. Any decrease in fees experienced by the Plan paled in comparison to decreases that would have resulted from wielding the Plan's growing size and other leverage appropriately. *Id.*, ¶¶ 158-59. At all times during the Class Period, the Plan's fees far exceeded the reasonable rate for a plan the size of the Plan. *Id.* Toward the end of the Class Period the Plan's fees remained stagnant when they should have decreased due to the increase in participant size. *Id.*

The FAC's chart demonstrates the excessiveness of the Plan's RKA fees by comparing the fees of 16 plans that were similar in size and services ("Comparator Plans") during the Class Period. *See* FAC, ¶ 163. Services are derived from the Plan's Department of Labor Form 5500 service codes. *Id.*, ¶ 163 n.32. The average of the Comparator Plans' fees equals $24.19 per participant, well below what the Plan was paying throughout the Class Period. *Id.*, ¶ 164. Several of the Comparator Plans also had Fidelity as a recordkeeper. *Id.*, ¶¶ 163, 170-76. In fact, Fidelity stipulated that plans in the Plan's size category could negotiate for RKA fees ranging "from $14-

$21 per person per year[,]" while receiving the same value of services for that cost. *Id*., ¶¶ 172-77 (the "Stipulation").

## IV.    ARGUMENT

### A.    Plaintiffs Plausibly Allege that the Plan's RKA Fees Are Excessive

#### 1.    Defendants' Improperly Attach the Recordkeeping Agreement

In the Fifth Circuit, "courts should consider a motion to dismiss based on the four-corners of the plaintiff's pleadings, not the evidence that Defendants may seek to introduce in response." *Ramos v. Taylor*, 646 F. Supp. 3d 807, 814 (W.D. Tex. 2022) (citing *Villarreal v. Wells Fargo Bank*, *N.A.*, 814 F.3d 763, 766 (5th Cir. 2016)). There is a narrow exception under the incorporation-by-reference doctrine for documents "that are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims." *Seidner*, 2023 WL 2728714, at *5 (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)). "[A] 'reference' to" a document "does not automatically make that evidence [] central to Plaintiff's claim." *Ramos*, 646 F. Supp. 3d at 815; *see also Polnac v. City of Sulphur Springs*, 555 F. Supp. 3d 309, 325 (E.D. Tex. 2021) ("Plaintiff's complaint generally mentions the [exhibit]… However, Plaintiff does not pull direct quotes from the [exhibit] nor does Plaintiff attach [it]."). Further, when this "limited exception" applies, the court may not take judicial notice of "the *contents* of those documents [including] any 'facts' contained in [them] … [that] are subject to reasonable dispute." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 665 (N.D. Tex. 2011) (emphasis in original, internal citations omitted); *see also Polnac*, 555 F. Supp. 3d at 325 ("the facts contained within the [exhibit] are not documents incorporated into the complaint by reference."). Otherwise, it would contradict the well settled law that "the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint." *Ramos*, 646 F. Supp. 3d at 814.

As discussed *supra*, Plaintiffs were denied access to the Agreement, yet Defendants are now attaching the Agreement in an attempt to contradict the FAC's well-pled allegations. MTD at 13. Although the Agreement does not disprove the allegations in the FAC, it is still improper for Defendants to attach the Agreement and ask this Court to draw inferences from the Agreement in their favor. *See Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 537-39 (5th Cir. 2003). As a threshold matter, the Agreement cannot possibly be central to Plaintiffs' claim because Plaintiffs were prohibited from seeing it. *See*, *e.g.*, *Ramos*, 646 F. Supp. 3d at 815; *Polnac*, 555 F. Supp. 3d at 325. Moreover, the factual interpretation of the Agreement leads to a dispute as to whether Fidelity's services to the Plan justify the fees incurred or materially differ from the services offered by all recordkeepers. Hence, Defendants improperly attach the Agreement "in order to avoid [the court] accepting […] the [Plaintiffs'] allegations as true, as well as all reasonable inferences therefrom." *Kaye*, 453 B.R. at 665. Only the plausibility of the FAC's inferences, not Defendants' defenses, are relevant here. Thus, "[t]here are appropriate stages in the proceedings for the Defendants to introduce evidence challenging the reasonableness of such inferences, but this is not one of those stages." *Id*.

### 2.    The Complaint Alleges Apt Fee Comparisons

In *Perkins*, the Fifth Circuit held that the challenged complaint was sufficiently plausible by alleging that "as the number of participants in a plan increases, the per-participant cost for recordkeeping services decreases." *Perkins*, 2024 WL 1574342, at **4-5. The Fifth Circuit refuted the defendants' arguments that "the Plaintiffs' recordkeeping fee allegations failed to include 'allegations about the specific services rendered in exchange for fees [and] failed to allege facts necessary to conduct a like-for-like comparison with other plans." *Id*. Like here, the services alleged in *Perkins* were based on Form 5500 codes for "recordkeeping fees services," while any

differences between service codes "cannot account for [the] discrepancy" between the fees. *Id.*, at *4 n.6; *see also* FAC, ¶ 163 n.32; *Mator*, 102 F.4th at 186 ("The different service codes do not undermine the Mators' comparisons because they apparently overlap."). Both the FAC and *Perkins'* Complaint allege that "[t]hese services are offered by all recordkeepers for one price" and "[t]he services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services." *See* Ex. C, "*Perkins* Complaint", ¶ 65; FAC, ¶ 130. Thus, Defendants incorrectly argue that this exact language is "summarily" and insufficient here. MTD at 13-14. In fact, *Perkins* joined many other Circuits' Court of Appeals and "the majority of judges addressing specific allegations regarding the fungibility and commodification of recordkeeping services [who] have found the excessive-fees claims to be plausible." *Dionicio v. U.S. Bancorp.,* No. 23-cv-0026, 2024 WL 1216519, at *5 (D. Minn. June 4, 2024); *see also Hughes II*, 63 F.4th at 632; *Mator*, 102 F.4th at 187-89; *Braden v. Wal-Mart Stores*, 588 F.3d 585, 601 n.9 (8th Cir. 2009); *Seidner*, 2023 WL 2728714, at *6 ("Whether Plaintiffs' calculations of recordkeeping fees for the Plan and alleged comparators are flawed and unreliable is not appropriate for consideration at the motion to dismiss stage."); *Blackmon*, 2021 WL 2190907, at *7 (similar). Thus, contrary to Defendants' mischaracterization of the FAC, Plaintiffs sufficiently "consider[] the services provided in exchange for the fees." MTD at 14. Oddly, Defendants rely on *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B*., 727 F.3d 502, 504 (6th Cir. 2013), an Equal Credit Opportunity Act case from another Circuit issued over a decade ago, to argue that "Plaintiffs' charts, however, do not compare any of the services provided to their comparator plans." MTD at 15.

Defendants also misconstrue *Perkins*' holding regarding "similar retirement plans." MTD at 13. *Perkins* held that allegations of similarly sized plans are one way to create the inference of excessive fees (*see Perkins*, 2024 WL 1574342, at *5), not, as Defendants argue, that every aspect

of every plan needs to be identical. MTD at 13. *Perkins* did not draw bright line rules defining what "a [sufficiently] similar number of participants" would entail or how many plans need to be provided. MTD at 15. Nonetheless, all of the Comparator Plans here are similarly sized, including six plans within 8% of the Plan's participant size. *See* FAC, ¶ 163; *see also Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 187 (3d Cir. 2024) (four comparator plans within "75% to 125%" of the plan's size was sufficient; however, "[d]rawing bright lines would run counter to the required contextual analysis, so we do not adopt any rules limiting comparator size or requiring a specific number of comparators.").

The Comparator Plans are all defined contribution plans, and at least one is a 403(b) plan. Defendants provide no case law when they incorrectly argue that this is a flaw. *See* MTD at 16. Nor do Defendants provide any case law or reasoning that Plaintiffs must include "fees charged by a recordkeeper servicing two retirement plans for a single plan sponsor." MTD at 16. In fact, Defendants ignore the central point of Plaintiffs' allegations that: (1) the Memorial Hermann Plans are compared to each other because they have drastically different sizes but pay the same amount to the same recordkeeper; and (2) Defendants should have obtained discounts from paying Fidelity to service two plans on top of Fidelity's investment fees. *See* FAC, ¶¶ 155-56. Defendants also mischaracterize the fee reduction allegations in FAC. *See* MTD at 16. The reductions were insufficient to bring the RKA fees in line with reasonable rates, were not proportionate to the increase in participant counts, and did not "decrease[] in each year during the Relevant Period" (MTD at 16) because they remained the same when they should have decreased. *See* FAC, ¶¶ 158-59. Indeed, the fee decrease in the *Perkins* Complaint did not warrant dismissal. *See* Perkins Complaint, ¶ 75. In fact, Defendants' citation to *Matney v. Barrick Gold of N. Am.,* actually shows that "regularly re-negotiated [] fee arrangements" result in significantly greater fee reductions than

11

the non-negotiated fees here. *Matney*, 80 F.4th 1136, 1156 (10th Cir. 2023). The plan in *Matney* experienced a $16 reduction in 2015, a $17 reduction in 2017, and a $15 reduction in 2020 (*see id.*), whereas $4.99 was the ***highest*** reduction here. FAC, ¶ 158. Illusory fee decreases do not prove prudent processes or reasonable fee amounts.

Lastly, Defendants' argument that "multiple courts have rejected" the Fidelity Stipulation allegation also fails. MTD at 18. Actually, more courts have found the Stipulation is sufficiently inferential. *See*, *e.g.*, *Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, 629 F. Supp. 3d 352, 364 (M.D.N.C. 2022); *Teodosio v. DaVita, Inc.*, 684 F. Supp. 3d 1117, 1127 (D. Colo. 2023); *McDonald v. Lab'y Corp. of Am. Holdings*, No. 22-cv-680, 2023 WL 4850693, at *6 (M.D.N.C. July 28, 2023); *Stengl v. L3Harris Techs., Inc.*, No. 22-cv-572, 2023 WL 2633333, at *5 (M.D. Fla. Mar. 24, 2023). The Stipulation is especially relevant to this case because Fidelity is/was the Plan's recordkeeper at all relevant times. On the other hand, in Defendants' unpublished, out-of-Circuit cases, two plans did not have Fidelity as the recordkeeper. *See* MTD at 18. The sole case that did have Fidelity as a recordkeeper, *Wehner v. Genentech, Inc.*, later upheld an amended complaint because one alleged comparator also "utilized Fidelity [] as their recordkeeper" while having "roughly the same amount of plan participants, yet the [other] Plan deducted significantly less in fess." *Wehner*, No. 20-cv-06894, 2021 WL 2417098, at *1 (N.D. Cal. June 14, 2021). The FAC includes several plans recordkept by Fidelity. FAC, ¶ 171. Therefore, the Stipulation adds to the plausibility of the FAC.

### 3.    Defendants' Other RKA Arguments Fail

Defendants' two remaining RKA arguments are equally meritless. First, Defendants attempt to discredit Plaintiffs' RFP allegations. *See* MTD at 17. To the contrary, *Perkins* forecloses Defendants' argument. "Plaintiffs allege that the Defendants could have taken certain steps to

mitigate the Plan's recordkeeping costs. But they did not do so. Faced with similar allegations concerning recordkeeping costs, at least three other circuit courts have declined to dismiss a duty of prudence claim." *Perkins*, 2024 WL 157434, at *4; *see also id*., n.7 ("there are steps that prudent fiduciaries take to minimize recordkeeping costs, such as regularly soliciting competitive bids."); *Hughes II*, 63 F.4th at 621-22 (upholding claims that "Northwestern should have lowered its expenses by […], soliciting bids from competing providers, and using the massive size and correspondent bargaining power of the Plans to negotiate."); *Mator*, 102 F.4th at 180 (upholding the allegation that "the competitive bidding process should be conducted 'at least once every three to five years.' […] Yet Wesco failed to do so."). Defendants rely on an insurance policy case brought under Louisiana Law to argue that the FAC's RFP allegations are mere "speculation." *See* MTD at 17 (citing *Sonnier v. State Farm Mutual*, 509 F.3d 673, 675 (5th Cir. 2007)).

Defendants' final argument misconstrues allegations in two other case's complaints that alleged materially different facts. Importantly, ***neither*** complaint alleged that "$40 per participant is a reasonable fee." MTD at 19 (referring to Dkt. 10, Exs. B "*ARC* Complaint" and C "*Moore* Complaint"). In fact, the *ARC* Complaint alleged that "the Plan, with over $1.2 billion dollars in assets and over 22,000 participants in 2019, ***should have had direct recordkeeping costs below the $5 average***, which it clearly did not." ¶ 71 (emphasis added). In *Moore*, the court found that the later amended complaint plausibly alleged a $37 per participant RKA fee was excessive, even though those defendants conducted an RFP that resulted in a fee decrease. *See Moore v. Humana, Inc.*, No. 21-cv-232, 2022 WL 20766503, at *1 (W.D. Ky. Mar. 31, 2022), *reconsideration denied*, No. 21-cv-232, 2022 WL 20766504 (W.D. Ky. Dec. 2, 2022). Furthermore, a reasonable fee for other plans in different circumstances are irrelevant here due to "the context-specific inquiry that ERISA requires" for each complaint. *Hughes I*, 142 S. Ct. at 740. For instance, neither of

Defendants' exhibits include repeat business discount allegations, a chart of comparator plans, nor other plans paying its same recordkeeper less, unlike the allegations here.

**B. Plaintiffs' Challenged Investment Allegations are Plausibly Alleged**

**1. The JPMorgan TDFs Underperformed Regardless of Share Class**

Defendants rely on the fact that the FAC's performance and rankings charts use the A-share class rather than the R6 class used in the Plan. MTD at 9. Notably, Defendants do not attempt to argue how different share classes would have different performance outcomes. Nor could they. As many courts recognize, the only difference between share classes is price. *Hughes I*, 142 S. Ct. at 741; *Tibble,* 575 U.S. at 526 (2015); *Perkins*, 2024 WL 1574342, at *3 (same); *Johnson*, 2024 WL 4834717, at *3. Hence, the ***only*** difference is in the amount of losses (which is measured net-of-fees), not liability or plausibility. The PSAC demonstrates that all of the vintages of R6 share classes underperformed against the same Comparators over the same time period. *See* PSAC ¶ 101. Defendants ignore the comparator funds in the original complaint, but note that the FAC, like the PSAC, includes "comparator funds, in addition to the Morningstar Index, and [includes] multiple TDF vintages." MTD at 9. Although the Comparators are meaningful, courts in this Circuit do not "require[e] a meaningful benchmark" at this stage. *Laliberte v. Quanta Services Inc.*, 22-cv-03290, Slip Op., at 4 (S.D. Tex Sep. 29, 2023). It is sufficient that all of the JPMorgan TDF vintages, 2030-2060, consistently underperformed both the Index and Comparator Funds before and during the Class Period with a few negligible exceptions (9 out of 121 comparisons, or 7.4%), and they were consistently placed in the bottom half quartile of peer rankings. *See* PSAC, ¶¶ 101-08; *see also* FAC, ¶¶ 101-07. The PSAC resolves Defendants' main issue by replacing the A-share class data with R6 share class data while using the same comparators, vintages, and time period as the FAC. *See* PSAC, ¶¶ 101-07; FAC ¶¶ 101-07.

Defendants believe the degree of the R6's underperformance, as alleged in the original complaint, was not-that-bad. MTD at 9. However, this question of fact is not appropriate at this stage, because "[j]ust as it is true that the Court may not assume a violation of fiduciary duty based upon evidence of severe losses alone, neither may the Court conclude that these same duties were not violated simply because the Fund did not suffer huge actual losses." *Olsen v. Hegarty*, 180 F. Supp. 2d 552, 569 (D.N.J. 2001); *see also Karg v. Transamerica Corp.*, No. 18-cv-134, 2019 WL 3938471, at *7 (N.D. Iowa Aug. 20, 2019) (positive performance "in certain years within the period" did not undermine the fact that "each of the challenged funds failed to outperform the comparable funds or the relevant benchmark over the relevant period as a whole," thereby creating a "factual issue."); *Bouvy v. Analog Devices, Inc.*, No. 19-cv-881, 2020 WL 3448385, at *9 n.7 (S.D. Cal. June 24, 2020) ("Defendants challenge the factual basis for Plaintiff's claims, including by showing that some funds did not underperform, Plaintiff provided enough information to create a factual inference that they indeed underperformed."); *Kistler v. Stanley Black & Decker, Inc*., No. 22-cv-966, 2024 WL 3292543, at **11-12 (D. Conn. July 3, 2024) (same).

Although the R6 shares were still costlier than some comparator funds, Plaintiffs are no longer pursuing the excessive investment fee allegations. Like in *Perkins*, Plaintiffs' performance claims may survive because Plaintiffs' RKA fee allegations are plausibly alleged. *See Perkins*, 2024 WL 1574342, at *5 n.9 ("Plaintiffs also made [investment performance] allegations supporting their claim […] But because" the recordkeeping allegations were plausible, "we need not address whether these other allegations also support a claim for which relief can be granted. *See* FED. R. CIV. P. 8(d)(2)."). Notably, the performance data alleged is net-of-fees; therefore, the PSAC rules out any alternative explanation that the fees justified the retention of the poorly performing funds.

## 2.    Imprudent Investment Review Processes are Plausibly Alleged

"[A]n ERISA fiduciary has an obligation not only to select prudent investments, but also to remove imprudent ones." *Johnson*, 2024 WL 4834717, at *5. This "continuing duty […] exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble*, 135 S. Ct. at 1828 (2015); *see also Hughes I*, 142 S. Ct. at 741. Outside of the easily resolved flaws in the FAC's performance charts, Defendants' arguments rest on the incorrect premise that "Plaintiffs offer no allegations about the Committee's process for selecting the JP Morgan R6 TDFs[,]" but Defendants correctly note that Plaintiffs may plead "circumstantial facts that would permit this Court to infer imprudence with respect to the Committee's investment monitoring process." MTD at 8 (citing *Perkins*, 2024 WL 1574342, at *2).

"In determining compliance with ERISA's prudent man standard, […] the appropriate inquiry is whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment." *Bussian v. RJR Nabisco, Inc.,* 223 F.3d 286, 299 (5th Cir. 2000). However, this evaluation occurs "after sufficient time for discovery[,]" particularly because of the defendants' asymmetrical access to information. *Blackmon*, 2021 WL 2190907, at *6 (quoting *Sweda*, 923 F.3d at 329). With dismal performance data available as early as 2014, the FAC (as well as the PSAC) alleges that the JPMorgan TDFs were an imprudent selection for the Plan, and were imprudently retained in the Plan for too long**,** based on information Defendants knew or should have known at the time of their decision making. *See* FAC, ¶¶ 74, 92, 98-101, 108-11; PSAC, ¶¶ 74, 92, 98-101, 108-11. This information was knowable based on the Plan's IPS and public data, including Morningstar data referenced in the Participant Disclosures. *Id.*; *see also Trauernicht v. Genworth Fin. Inc.*, No. 22-cv-532, 2023 WL 5961651, at *13 (E.D. Va. Sept. 13, 2023) (a complaint is plausible "when it relies on the same

data for one of its comparisons [as the plan's fiduciaries used]."). Defendants also incorrectly argue that courts have held that allegations that a fund underperformed "before" and "during the Relevant Period" are "insufficient to plausibly state a claim for breach of ERISA's fiduciary duty[,]" but Defendants ***do not offer any support***. MTD at 8. Of course, the opposite is true. Courts routinely uphold "allegations that the Committee failed for years to perform sufficient reviews or investigations into the Plan's performance. [Because] it is plausible that Defendants had access to performance data at various points throughout the relevant period, and Plaintiffs' allegation is that Defendants did not adequately consider that information." *Garcia v. Alticor, Inc.*, No. 20-cv-1078, 2021 WL 5537520, at *7 (W.D. Mich. Aug. 9, 2021) (emphasis in original); *see also Johnson*, 2024 WL 4834717 *5 ("the [challenged] Funds' alleged underperformance could impact Parker-Hannifin's prudence in nonetheless choosing to retain the funds"); *Sellers v. Trustees of Coll.*, 647 F. Supp. 3d 14, 22 (D. Mass. 2022) (denying the defendants' motion to dismiss because, "Boston College ignored public red flags about certain investment offerings."); *Muri v. Nat'l Indem. Co.*, No. 17-cv-178, 2018 WL 1054326, at *5–6 (D. Neb. Feb. 26, 2018) (same); *Kistler*, 2024 WL 3292543, at *11-12 (same); *see also Grp. 1 Auto., Inc. v. Aetna Life Ins. Co.*, No. 20-cv-1290, 2020 WL 8299592, at *3 (S.D. Tex. Nov. 9, 2020) ("these red flags should have caused Aetna to deny, or at least investigate those [issues]."). Thus, the FAC plausibly alleges that "[a] reasonable factfinder could conclude that an appropriate investigation would have revealed this information and that such information, when weighed against the information that should have been gathered on other providers, would cause a fiduciary to eliminate" the JPMorgan TDFs. *Bussian*, 223 F.3d at 307.

Finally, although some complaints have been dismissed for "alleging some other alternative fund in the market allegedly performed better than a challenged fund, without more[,]"

that is not the case here. MTD at 10. As a threshold matter, the JPMorgan TDFs are compared to more than just "some other alternative fund[,]" but instead four similar TDFs and a "a widely known index of securities" from Morningstar a source deemed reputable by the participant disclosures. *See* FAC, ¶¶ 74, 92, 98-101, 108-11. Second, Defendants support their contention with out-of-Circuit cases that this Court has aptly noted does not apply here: "[t]he Fifth Circuit has not adopted the Sixth Circuit's holding in *Smith* nor the Eighth Circuit's holding in *Meiners* requiring a meaningful benchmark. Moreover, the Fifth Circuit has not commented on which stage of the litigation, if any, is most appropriate for lower courts to consider arguments regarding whether the meaningful benchmark requirement was met." *Laliberte*, 22-cv-03290, at 4 (citing *Blackmon*, 2021 WL 2190907, at *5 n.1); *see also Seidner*, 2023 WL 2728714, at*7 ("other courts considering similar issues have held that the determination of the appropriate benchmark for a fund is not properly resolved at the motion to dismiss stage."). The only case from this Circuit that Defendants cite is *Locascio v. Fluor Corp*., No. 22-cv-0154, 2023 WL 320000, at *6 (N.D. Tex. Jan. 18, 2023) which is an outlier, and as this Court noted, the *Locasio* Court held that "[t]he Fifth Circuit has yet to define" what a meaningful benchmark entails. *Laliberte*, 22-cv-03290, at 5 (quoting *Locascio*, 2023 WL 320000, at *6). Like *Laliberte*, *Seidner*, and *Blackmon*, "Plaintiffs' allegations here, coupled with suggested comparisons, permit the Court to reasonably infer imprudence by the fiduciaries." *Id.* (quoting *Blackmon*, 2021 WL 2190907, at *5). The MTD does not discuss *Laliberte*, *Blackmon*, or *Seidner*. Lastly, Plaintiffs' RKA fee allegations are sufficient to survive the motion to dismiss stage, so the Court does not need to evaluate the investment performance allegations. *Perkins*, 2024 WL 1574342, at *5 n.9.

    **C.**    **Leave to Amend Should be Granted**

The Fifth Circuit has a "liberal pleading presumption underlying Rule 15(a)" with "a bias in favor of granting leave to amend." *Dueling v. Devon Energy Corp.*, 623 F. App'x 127, 128 (5th Cir. 2015) (citations omitted). "[R]easons for denying leave to amend include undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies, or undue prejudice," however, "delay alone is an insufficient basis for denial" and "[t]he touchstone for denial […] is prejudice." *Id*. at 130. There is no bad faith, undue delay, or prejudice here, where "[t]he proposed amended complaint does not include new legal theories[,]" "only one amendment has been allowed" and discovery has not commenced. *Id*. at 131. There is also no futility because the underperformance claims are plausibly alleged in the FAC and PSAC, and the PSAC removes the investment fee allegations. The PSAC cures the FAC's charts without adding allegations that potentially provide reasons for denying leave to amend. Lastly, because of the FAC's plausible RKA fee allegations, the PSAC does not require a new briefing stage. *See Perkins*, 2024 WL 1574342, at *5 n.9.

### D.    Plaintiffs' Duty to Monitor Claims are Plausible

Plaintiffs acknowledge that "a duty-to-monitor claim is derivative" of an imprudence claim. MTD at 19. *Laliberte*, 22-cv-03290, at 6; *Seidner*, 2023 WL 2728714, at *8; *Blackmon*, 2021 WL 2190907, at *7. Because Plaintiffs' imprudence claim is plausibly alleged, so too is Plaintiffs' Duty to Monitor Claim. *Id*. Plaintiffs also allege that "the 'Monitoring Defendants' had the authority to appoint and remove members of the Committee, and the duty to monitor the Prudence Defendants and were aware that the Prudence Defendants had critical responsibilities as fiduciaries of the Plan." FAC, ¶¶ 188-92. These allegations disprove Defendants' argument that Plaintiffs have not alleged "why sufficient monitoring would have caused' the Defendants to take the actions Plaintiffs allege they should have taken." MTD at 19-20. Defendants cite *Locascio*, but those plaintiffs failed to allege the underlying breaches that the monitoring defendants could have

19

acted on. This case is similar to *Blackmon* where the underlying breaches were plausibly alleged and the monitoring defendants were "responsible for appointing, overseeing, and removing members of the Committee." *Blackmon*, 2021 WL 2190907, at *7. In responding to the same arguments Defendants here make, *Blackmon* noted that "the Fifth Circuit has yet to recognize an ERISA theory of liability for failing to monitor fiduciaries[;]" yet, "courts in the Fifth Circuit have recognized a failure to monitor theory of liability" like the instant theory. *Id.* (listing cases).

Defendants' third incorrect argument is that "[FED. R. CIV. P.] 17 requires that a party must have the capacity to [] be sued, and under Texas law, Plaintiffs do not have the capacity to sue the Board." MTD at 20. Defendants rely on the unpublished district court decision in *Sain v. Collier*, No. 18–cv-4412, 2019 WL 4144321 (S.D. Tex. Aug. 30, 2019), which was not an ERISA case, but solely pertained to "a ***governmental department or political subdivision***." *Sain*, 2019 WL 4144321, at *10. *Blackmon, Laliberte,* and *Seidner* clearly disprove Defendants' argument.

## I.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' motion to dismiss in its entirety, or in the alternative, grant Plaintiffs leave to amend.

Date: January 8, 2024

**THE LAW OFFICES OF KELL A. SIMON**
Kell A. Simon, Esquire
TX Atty. Bar #24060888
501 North IH-35, Suite 111
Austin, TX 78702
Tel: (512) 898-9662
Fax: (512) 368-9144

**CAPOZZI ADLER, P.C**
*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney I.D. # 88587
James A. Maro, Esquire
PA Attorney I.D. # 86420
312 Old Lancaster Road
Merion Station, PA 19066
Email:  markg@capozziadler.com
      jamesm@capozziadler.com
Tel: (610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 8, 2024, a true copy of the foregoing document was filed with the Court using its ECF system, which will send notice of this filing to all counsel of record.

**<u>CERTIFICATE OF CONFERENCE</u>**

I hereby certify that between December 30, 2024, and January 8, 2025, Counsel for the respective Parties conferred regarding Plaintiffs' request to file the Proposed Second Amended Complaint. Defense Counsel stated that they oppose the request.

By:  */s/ Mark K. Gyandoh*
      Mark K. Gyandoh