EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

DESRI JONES, JANET FLEMING,   )
SANDA MOODY and TIFFANI BENOIT, )
individually and on behalf of all others )     **CIVIL ACTION NO.: 4:24-cv-2105**
similarly situated,   )
  )
                Plaintiffs,   )
     v.   )
  )
MEMORIAL HERMANN HEALTH   )
SYSTEM, THE BOARD OF DIRECTORS )
OF THE MEMORIAL HERMANN   )
HEALTH SYSTEM, THE MEMORIAL )
HERMANN HEALTH SYSTEM   )
BENEFITS COMMITTEE and JOHN )
DOES 1- 30~~,~~   )
  )
                Defendants.   )

### ~~FIRST~~SECOND AMENDED CLASS ACTION COMPLAINT[1]

Plaintiffs, Desri Jones, Janet Fleming, Sanda Moody and Tiffani Benoit ("Plaintiffs"), by and through their attorneys, on behalf of the Memorial Hermann Health System Employees' Retirement Savings Plan (the "Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

**Formatted:** Left, Indent: Left:  0"

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

---

[1] ~~This amended complaint is being filed pursuant to FED. R. CIV. P. 15(a)(2) and the Parties' Joint Motion for Entry of Briefing Schedule (ECF No. 11).~~

[2] The Plan is also known as the Memorial Hermann Health System 403(b) Employee Retirement Savings Plan. The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants. The Plan type is 403(b) defined contribution plan.

Plan's fiduciaries, which include the Memorial Hermann Health System ("MHHS" or "Company") and the Board of Directors of Memorial Hermann Health System and its members during the Class Period[3] ("Board") and the Memorial Hermann Health System Benefits Committee and its members during the Class Period ("Committee").

2.      To safeguard the Plan's participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at *14 (W.D. Tex. 2011), *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

3.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See, "A Look at 401(k) Plan Fees," infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options and other fees. "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

---

[3] As will be discussed in more detail below, the Class Period, is defined as June 4, 2018, through the date of judgment (the "Class Period").

5.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

6.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.     The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).

8.     At all times during the Class Period, the Plan had at least $1.3 billion dollars in assets under management. *See* 2018 Department of Labor ("DOL") Form 5500 for the Plan. At the Plan's fiscal year end in 2023, the Plan had $2,784,471,411 billion dollars in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2023 Form 5500.

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

3

9.      The Plan's assets under management make it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2018, only 82 403(b) plans out of 18,478 in the DOL Universe or 0.5% of all 403(b) plans had more than $1 billion in assets.[5] This number remained relatively constant into 2020, where, by that time, only 127 403(b) plans out of 17,980 available or 0.7% of 403(b) plans had more than $1 billion in assets.[6] As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not exercise appropriate judgment in scrutinizing each investment option, initially and on an ongoing basis, that was offered in the Plan to ensure they were prudent.

10.     The Plan is also large in terms of the number of participants. From 2018 to 2023 it had over 25,000 participants with account balances. In 2020, less than 0.71% of 403(b) plans had 10,000 or more participants (127 out of 17,980).[7] The "10,000 or more" tier is the highest tier for grouping plans by participant size, likely because there are so few plans with over 10,000 participants like the Plan.

11.     Indeed, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the DOL by retirement plans, in 2020, there were only 194 defined contribution plans (including 401k, 401a, and 403b) in the country with 20,000 to 29,999 participants with account balances.

---

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans, 2018 at p. 7., available at https://www.ici.org/system/files/2022-03/22-ppr-dcplan-profile-403b.pdf.

[6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans, 2020 at p. 7., available at https://www.ici.org/system/files/2024-04/24-ppr-dcplan-profile-403b.pdf.

[7] *Id*.

12.    Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of risk and performance; and (2) failing to control the Plan's Recordkeeping and Administration costs ("RKA").

13.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    ~~IV.~~    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

16.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant

5

to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.    V.  PARTIES

**Formatted:** List Paragraph, Indent: Left:  0", Numbered + Level: 1 + Numbering Style: I, II, III, … + Start at: 1 + Alignment: Left + Aligned at:  0.25" + Indent at:  0.75"

**Plaintiffs**

18.    Plaintiff, Desri Jones ("Jones"), resides in Lubbock, Texas. During her employment, Plaintiff Jones was subject to the excessive RKA costs of the 403(b) Plan described herein and suffered injury to her 403(b) Plan account by paying fees well above reasonable market rates for the same. In addition, she participated in the 403(b) Plan investing in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Jones invested in several funds offered by the 403(b) Plan but she specifically invested in the JPMCB SmartRetirement R6 target date series which includes funds from 2025 through 2060 in five year increments based on an individual's expected retirement date ("JPMorgan SmartRetirement R6 Series"). She specifically invested in the JPMorgan SmartRetirement 2045 R6 fund, described herein. She suffered injury to her 403(b) Plan account from the significant underperformance of this fund. In addition, Plaintiff Jones suffered injury to her 403(b) Plan account by having to pay for her share of Plan investment advisory fees, which were unreasonable, because fees paid to Strategic Advisors, Inc. and Towers Watson Investment Services cannot be justified given the underperforming funds in the Plan.

19.    Plaintiff, Janet Fleming ("Fleming"), resides in Houston, Texas. During her employment, Plaintiff Fleming was subject to the excessive RKA costs for her participation in the 403(b) Plan described herein and suffered injury to her Plan accounts by paying fees well above reasonable market rates for the same. In addition, she invested in the investment options offered by the Plans that are challenged in this lawsuit. Plaintiff Fleming invested in several funds offered by the Plan but she invested in the JPMCB SmartRetirement R6 Series, specifically the JPMorgan SmartRetirement 2025 R6 fund described herein. She suffered injury to her Plan account from the

6

significant underperformance of this fund in both Plan. In addition, Plaintiff Fleming suffered injury to her Plan account by having to pay for her share of investment advisory fees to the Plan's investment advisors, which were unreasonable, given the underperforming funds in the Plan. Plaintiff Fleming also participated in Memorial Hermann's 401(k) Plan which included the same investments as the Plan, and separately paid Strategic Advisors for advisory services as well as Fidelity for recordkeeping services to the 401(k) plan.

20.    Plaintiff, Sanda Moody ("Moody"), resides in Houston, Texas. During her employment, Plaintiff Moody was subject to the excessive RKA costs of the 403(b) Plan described herein and suffered injury to her 403(b) Plan account by paying fees well above reasonable market rates for the same. In addition, she participated and invested in the 403(b) Plan investing in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Moody invested in several funds offered by the 403(b) Plan including the JPMCB SmartRetirement R6 Series. She specifically invested in the JPMorgan SmartRetirement R6 2035 fund. She suffered injury to her 403(b) Plan account from the significant underperformance of this fund. In addition, Plaintiff Moody suffered injury to her 403(b) Plan account by having to pay for her share of investment advisory fees to the Plan's investment advisors, which were unreasonable, given the underperforming funds in the Plan.

21.    Plaintiff, Tiffani Benoit ("Benoit"), resides in Lake Arthur, Louisiana. During her employment, Plaintiff Benoit was subject to the excessive RKA costs of the 403(b) Plan described herein and suffered injury to her 403(b) Plan account by paying fees well above reasonable market rates for the same. In addition, she participated and invested in the 403(b) Plan investing in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Benoit invested in one of the funds offered by the 403(b) Plan which is contained in the JPMCB SmartRetirement R6 Series, specifically the JPMorgan SmartRetirment Income fund, described herein. She suffered injury to

her 403(b) Plan account from the significant underperformance of this fund. In addition, Plaintiff Benoit suffered injury to her 403(b) Plan account by having to pay for her share of investment advisory fees to the Plan's investment advisors, which were unreasonable, given the underperforming funds in the Plans.

22.      Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct.  Further, Plaintiffs have standing because their account balances were diminished by having to pay their share of investment advisory fees charged to the Plan for evaluating the Plan's funds, whether specifically identified herein or not.  Between 2018 and 2022, the Plan paid more than $2.3 million dollars to Strategic Advisors, Inc. for plan advisory services and it also paid Towers Watson Investment Services more than $429 thousand dollars for Investment advisory services. During the same time period, Strategic Advisors was also making more than $98,000 dollars for its services to Memorial Hermann's 401(k) Plan which held an identical menu of investments as the Plan. These fees were unreasonable given that the Plan fiduciaries' and advisors' performance was abysmal thus making the consulting fees unjustified for the services provided. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

23.      Plaintiffs did not have knowledge of all material facts (including, among other things, how target date funds and other funds in a retirement plan should perform as compared to their peers and benchmarks) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

8

**Defendants**

**Company Defendant**

24.    Memorial Hermann Health System is a named fiduciary of the Plans with a principal place of business at 929 Gessner Road, Suite 2700, Houston, Texas ("MHHS"). *See*, 2021 Form 5500. MHHS is a large health system of hospital and patient care centers located in the greater Houston area.[8] The system employs more than 32,000 individuals, 6,700 physicians, maintains 265 care delivery sites, including 17 hospitals. *Id.*

25.    Memorial Hermann, directly or acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The 2021 Investment Policy Statement of Memorial Hermann Health Systems ("IPS") at 1. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

26.    Accordingly, MHHS during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

27.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

28.    The Board appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than

---

[8] https://www.memorialhermann.org/about-us/president-ceo last accessed on January 11, 2024.

reasonable and performed well as compared to their peers. IPS at 1.  As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

29.    Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

30.    The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

31.    As discussed above, MHHS and/or the Board appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. IPS at 1.

32.    The IPS goes on to further define the Committee's role in selecting and monitoring the investment choices and fees as needing to be "selected on the basis of … absolute and relative performance objectives and fees." IPS at 3.

33.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan's assets.

34.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

10

**Additional John Doe Defendants**

35.    To the extent that there are additional officers, employees and/or contractors of MHHS who are/were fiduciaries of the Plan during the Class Period or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, MHHS officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV. ~~VI.~~ CLASS ACTION ALLEGATIONS[9]

36.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[10]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between June 4, 2018 through the date of judgment (the "Class Period").

37.    The members of the Class are so numerous that joinder of all members is impractical.  The 2023 Form 5500 lists 33,226 Plan "participants with account balances as of the end of the plan year."  2023 Form 5500 at 2.

---

[9] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[10] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

38.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan on a plan-wide basis. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

39.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

      A.     Whether Defendants are/were fiduciaries of the Plan;

      B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

      C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

      D.     The proper form of equitable and injunctive relief; and

      E.     The proper measure of monetary relief.

40.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

41.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

42.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## ~~VII.~~V.  THE PLAN

> **Formatted:** Indent: Left:  0", Numbered + Level: 1 + Numbering Style: I, II, III, … + Start at: 1 + Alignment: Left + Aligned at:  0.25" + Indent at:  0.75"

43.     The Plan is a defined contribution plan covering substantially all eligible employees of MHHS. *See* The Summary Plan Description of the Memorial Hermann Health System 403(b) Plan ("SPD") at 1. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *Id*.  Consequently, retirement benefits provided by the Plan is based solely on the amounts allocated to each individual's account. *Id.*

13

***Eligibility***

44.     In general, the Plan covers all employees of MHHS on their date of hire and who are 21 years of age or older. *Id.*

45.     Effective January 1, 2020, the Plan was amended to increase the required minimum distribution from age 70½ to age 72. *See* First Amendment to The Memorial Hermann Health System Employees' Retirement Savings Plan, signed June 27, 2022 (effective retroactively).

***Contributions***

46.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *See* SPD at 1-2.

47.     With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ("IRS") limitations. *Id.* With regard to contributions made by the employer, MHHS will match contributions made by the employee "dollar-for-dollar up to a certain percentage of [their] pay per payroll period, to a maximum limit which is determined annually by the IRS." *Id.* at 2.

48.     MMHS offers Plan participants who were employed on or after July 1, 2011, twice the match percentage as participants employed prior to July 1, 2011. *Id.*

49.     Like other companies that sponsor 403(b) plans for their employees, MHHS enjoys both direct and indirect benefits by providing matching contributions to the Plan's participants. Employers are generally permitted to take tax deductions for their contributions to  plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

14

50.     MHHS's employees benefit in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

51.     Given the size of the Plan, MHHS likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

52.     Participants are automatically vested in any contributions they made to their accounts themselves and any contributions made by MHHS, for employees hired after January 1, 2015, are subject to a three-year vesting schedule. *See* SPD at 2.

***The Plan's Investments***

53.     Per the IPS, the Committee is/was responsible for determining  the appropriateness of the Plan's investment offerings and monitors investment performance histories as against the appropriate benchmarks. *See* IPS at 5-13 (explaining that the benchmark will be "typically a widely known index of securities."). As will be discussed in more detail below, the Committee fell well short of these fiduciary expectations.

54.     Several funds were available to the Plan's participants for investment each year during the putative Class Period. Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

55.     The Plan and the Memorial Hermann 401(k) plan offer an identical menu of investments, but with different amounts invested in each product. Compare the 401(k) plan's 2019 Form 5500, at p. 25, with the 403(b) plan's 2019 Form 5500 at p. 71.

56.     In particular, both plans offered the proprietary investment products of their recordkeeper, Fidelity. *Id*. Specifically, they included the Fidelity BrokerageLink, Fidelity US

15

Bond Index, Fidelity 500 Index, Fidelity Total Market Index, and the Fidelity Total International Index. *Id.*

57.    In 2019 the plans had a combined $557,056,221 invested in Fidelity products. *Id.* The Plan alone had $516, 918, 230 invested in Fidelity products.

58.    In 2020, the plans had a combined $672,289,718 invested in the same Fidelity products. *See* the 401(k) plan's 2020 Form 5500, at 27; the 403(b) plan's 2020 Form 5500 at 194. The Plan alone had $628,869,882 invested in Fidelity products.

59.    In 2021, the amount increased again to $848,767,462. *See* the 401(k) plan's 2021 Form 5500, at 29; the 403(b) plan's 2021 Form 5500 at 101. The Plan alone had $797,954,488 invested in Fidelity products. Investment management fees for the Plan's investments are allocated to the participant's accounts. *See* SPD at 3.

***Payment of the Plan's Expenses***

60.    During the Class Period, administrative expenses were paid by using the Plan's assets. *See* SPD at 3.

VIII.VI.    **THE TOTALITY OF CIRCUMSTANCES DEMONSTRATES THAT THE PLAN'S FIDUCIARIES FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER**

A.    **Overview**

1.    **ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology for Evaluating Investments**

61.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

62.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under

16

ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.  As noted above, these fiduciary duties are the highest known to law. *Tatum*, 761 F.3d at 356.

63.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery.  *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

64.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Defendants to request, among other things, the Committee's meeting minutes and any recordkeeping agreements. This request was made on October 18, 2022. By letter dated November 17, 2022, MHHS denied the Plaintiffs' request for meeting minutes and recordkeeping agreements.

65.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

17

66.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors.

67.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…" DOL 408(b)(2) Regulation Fact Sheet.

68.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[11]

69.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

70.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

71.    With respect to investment returns, diligent investment professionals monitor the

---

[11] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

72.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

73.     The specific methodologies used to select prudent investments are primarily data driven.  Such data is provided by investment research companies like Morningstar, which is the most accepted source of investment performance information, as it has the most robust information on mutual funds, CITs, and other types of investments.  Indeed, Morningstar is used and trusted by virtually all financial professionals and fiduciaries.

74.     In fact, the Plan's 2022 Participant Disclosure states that Morningstar provides data for non-Fidelity products, including the returns for the JPMorgan SmartRetirement® target date funds challenged in this complaint. *See* Required Disclosure Information, MHHS 403(b) Participant Disclosure Notice dated September 12, 2022 at 8-19 ("2022 Participant Disclosure").

75.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

76.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S.Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.")

77.     Lastly, to the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as

those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

**2.      The Target Date Funds in the Plan**

78.      At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Target Date Funds ("TDFs").

79.      Target date series are a staple in every defined contribution plan. Although no two target date series are identical, the general strategy, underlying investments, and risk profile is the same across all target date series: "[a] target-date fund is a fund of funds that provides asset-class diversity through a blend of stocks and bonds. Portfolios are adjusted for lower risk as they approach a designated target date" of retirement.  https://www.morningstar.com/investing-definitions/target-date-funds.[12] The subtle differences between series are what makes them more or less prudent than others, especially in terms of performance predictability.

80.      TDFs "provide a valuable service to investors by relieving them of the need to manage their portfolios themselves." *Id*. Thus, target date series are an important set-it-and-forget it option for less savvy investors relying on their plan fiduciaries to select a prudent series for their plan.

81.      TDFs have been divided into two broad categories by some industry professionals based on the fund's glide path: "To" and "Through" target date funds. A "To" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. In contrast, a "Through" target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This method

---

[12] Last referenced September 5, 2024.

focuses on the life expectancy of the participant rather than the retirement date.

82.     However, for purposes of this Complaint, it matters little whether a target date fund is a through or a to fund since the earliest retirement target year will be excluded from this analysis, currently the 2025 year. Doing this allows all target date funds to be compared equally since only the performance and risk return characteristics in the early to middle of the target date path are considered for analysis. In fact, Morningstar, the most respected independent research database in the financial industry doesn't distinguish between a so called to or through fund as is indicated by the lack of a separate Morningstar category and index for to and through target date funds. Instead, all target date funds are expected to track the appropriate Morningstar indexes and benchmarks.

83.     During the Class Period, the Plan included in its menu of investment offerings the materially underperforming JPMorgan SmartRetirement R6 Series (defined above).

84.     The chart below details how much the 403(b) Plan had invested in this target date series from 2018 to 2022 (per the Form 5500s):

| Year | Assets in Target Date Funds |
|------|----------------------------|
| **2018** | $661,632,618 |
| **2019** | $884,519,304 |
| **2020** | $997,197,472 |
| **2021** | $1,208,993,792 |
| **2022** | $1,139,700, 227 |

With such a large amount invested in the JPMorgan SmartRetirement R6 Series, the Plan would have been able to choose virtually any available target date series for the Plan and negotiated the lowest expense ratios for these investments by the start of the Class Period.

85.     JPMorgan has offered Target Date Funds dating as far back as several years before the start of the Class Period.  The Plan selected the JPMorgan SmartRetirement R6 Series which are the only target date investing options in the Plan. In other words, participants in the Plan who

want to invest in a target date strategy have no choice other than the JPMorgan SmartRetirement R6 Series.

86.    Defendants, in particular, the Committee, were obligated under ERISA to carefully evaluate the JPMorgan SmartRetirement R6 Series before selecting them for inclusion in the Plan. The Committee was also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the JPMorgan SmartRetirement R6 Series on an ongoing basis thereafter.

87.    Beginning in 1994, the market for target date funds exploded with numerous investment managers offering a variety of different target date funds (defined herein as mutual funds and CITs alike).

88.    By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

89.    Established target date investment managers include, but are not limited to, American Funds, Massachusetts Financial Services ("MFS"), TIAA-CREF and T.Rowe Price. T.Rowe has offered target date funds for more than 20 years and American Funds, TIAA-CREF and MFS for approximately 15 years and those target date funds have provided stable investment returns to 401(k) plan participants.

**B.    The Plan's Fidcuiaries Failed to Adequately Monitor and Remove the JPMorgan SmartRetirement R6 Series**

~~**1.    The Challenged Investments Materially Underperformed Relative to Comparator Target Date Funds and Indexes**~~

90.    The JPMorgan TDFs consistently materially underperformed industry-accepted benchmarks for target date funds used by investment professionals as well as the benchmarks in the Series' disclosures.

91.     The JPMorgan SmartRetirement R6 Series can be compared to various similar TDFs ("Comparator Funds") and relevant indexes as benchmarks. The suitable Comparator Funds include the American Funds target date suite, MFS Lifetime target date suite, MoA Clear Passage target date suite and T. Rowe Price Retirement target date suite. These four target date suites are suitable Comparator Funds to the JPMorgan SmartRetirement R6 Series because Morningstar, the most well respected and accepted financial industry fund database places all five funds in the US Fund Target-Date Category and/or the US SA Target Date Category ("Target Date Category") and compares those funds to how an average fund in that category should perform by using the Morningstar Lifetime Moderate Index.

92.     The Morningstar Lifetime Moderate Index is also the appropriate index because it aligns with the IPS's instruction to use "a widely known index of securities" as performance benchmarks. IPS at 5.

93.     A Morningstar Category is assigned by placing funds into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . . Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." *See* Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019). The analysis in *Allegretti* similarly deals with the Morningstar Lifetime Moderate Index category. *Id*.

94.     Further, Morningstar itself states that it created its categories "to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed on a fund's prospectus often did not adequately explain how the fund was actually

23

invested." Morningstar Category Classification, 31 March 2022 ("Morningstar Classifier")[13] at page 5. The Morningstar Classifier goes on to state that "[f]or example, many funds claimed to be seeking 'growth,' but some of those were investing in established blue-chip companies while others were investing in small-cap companies." *Id.*

95.    Morningstar places the four Comparator Funds and the JPMorgan SmartRetirement R6 Series in the Target Date Category because the underlying holdings of each fund match the risk return profile of this category. The Target Date Category should concentrate its holdings in the large blend/risk return category. It's for this reason that the four Comparator Funds are accurate and suitable comparators along with the more than 200 funds that Morningstar has placed in the Target Date Category.[14]

96.    A prudent fiduciary should have used some or all of these benchmarks, or substantially similar benchmarks, to evaluate the performance of the JPMorgan SmartRetirement R6 Series as early as the inception of the Class Period, or sooner, and on an ongoing basis, thereafter.

97.    The performance of the JPMorgan SmartRetirement R6 Series lagged behind the performance of the applicable Comparator Funds for many years before the inception of the Class Period clearly showing that it was an imprudent choice for the Plan.

---

[13] Available at the following web address: https://advisor.morningstar.com/Enterprise/VTC/MorningstarCategoryClassificationforFunds_April2022.pdf. Last accessed on May 12, 2023.

[14] Each year, as funds are created or discontinued, the number of funds in this category varied but generally averaged slightly more than 200 funds for both the US Fund Target-Date Category and the US SA Target Date Category. The list of funds in this Morningstar category in any given year, would include various share classes of each target date suite. In addition, the 200 funds referenced is conservative as the US Fund Target-Date Category and the US SA Target Date Category each averaged approximately 200 funds each year in their respective categories and both are meant to track the same index, namely the Lifetime Moderate Index.

98.     The yearly performance as early as 2014, well before the inception of the Class Period, shows that the JPMorgan SmartRetirement R6 Series were, historically, an imprudent selection. It is clear that out of more than 200 Morningstar peer funds in the LT Mod target date group, the JPMorgan TDFs were poor, at best.

99.     As can be seen in the chart below, which compares the JPMorgan SmartRetirement R6 Series' performance relative to the Comparator Funds and the appropriate Morningstar Index, the Morningstar Lifetime Moderate Index, MSAAM40M, ("Morningstar Index"), it's clear the JPMorgan SmartRetirement R6 Series performed poorly as compared to its peers and the Morningstar Index. The Comparator Funds performed well above the Morningstar Index for the majority of the years before the Class Period while the JPMorgan TDFs performed below it the majority of the time. In the years leading up to the Class Period, the JPMorgan TDFs performed well below the Morningstar Index for several consecutive years and clearly should have been removed at that time or never have been included in the Plan.

100.    This obligation to select appropriate funds for the Plan and/or to monitor the funds selected, which is a clear obligation of the Plan fiduciaries under ERISA, is continuing and continued to be an appropriate reason for removal of the JPMorgan SmartRetirement R6 Series up to the start of the Class Period. The chart below uses a historical 3-and 5-year average, as is required by industry professionals and trust law on which ERISA is based. *Hughes*, 142 S.Ct. at 741; *see also* The PNC Financial Services Group, Inc., Assembling a Robust Investment Policy Statement for Endowments and Foundations, June 17, 2021 (a "fund's investment performance should be reviewed regularly, such as on an annual basis; however, the emphasis with regard to performance should be focused on results achieved over a full market cycle (typically a three-to-

25

five year period")").[15] Likewise, the Plan's IPS instructs that "3 years (with ideal of 5-year record)" is the appropriate length of performance history for determining whether a fund is an appropriate addition to the Plan. IPS at 20.

101.   This three-year and five-year average is based on total return meaning that the fees paid for the fund's maintenance and management are not factored into their performance. However, when taking into account total returns below, the Comparator Funds were the most cost-effective.

| Investment and Benchmark | 3 Year Return 1/1/2016 - 12/31/2018 | JPMorgan TDF % of Under-performance To Comparators | 5 Year Return 1/1/2014 - 12/31/2018 | JPMorgan TDF % of Under-performance To Comparators |
|---|---|---|---|---|
| **JPMorgan SmartRetirement® 2030 ~~A~~R6** | **5.~~00~~37** | | **4.~~14~~47** | |
| American Funds 2030 Trgt Date Retire R6 | 6.92 | ~~38.40~~28.86% | 5.63 | ~~36.03~~25.95% |
| MFS Lifetime 2030 I | 6.29 | ~~25.80~~17.13% | 4.47 | ~~8.10~~0.00% |
| MoA Clear Passage 2030 Fund | 6.29 | ~~25.80~~17.13% | 4.~~90~~9 | ~~18.54~~9.62% |
| T. Rowe Price Retirement 2030 | 6.43 | ~~2.23~~19.74% | 5.03 | ~~21.65~~12.53% |
| Benchmark: Morningstar Lifetime Mod 2030 TR USD | 6.26 | ~~25.20~~16.57% | 4.44 | ~~7.35~~-0.67% |
| **JPMorgan SmartRetirement® 2035 ~~A~~R6** | **5.~~08~~45** | | **4.~~17~~49** | |
| American Funds 2035 Trgt Date Retire R6 | 7.43 | ~~46.26~~36.33% | 5.95 | ~~42.72~~32.52% |
| MFS Lifetime 2035 I | 6.52 | ~~28.35~~19.63% | 4.65 | ~~11.58~~3.56% |
| MoA Clear Passage 2035 Fund | 6.53 | ~~28.54~~19.82% | 4.98 | ~~19.53~~10.91% |
| T. Rowe Price Retirement 2035 | 6.61 | ~~30.12~~21.28% | 5.18 | ~~24.19~~15.37% |
| Benchmark: Morningstar Lifetime Mod 2035 TR USD | 6.72 | ~~32.28~~23.30% | 4.61 | ~~10.69~~2.67% |
| **JPMorgan SmartRetirement® 2040 ~~A~~R6** | **5.~~34~~71** | | **4.~~30~~63** | |
| American Funds 2040 Trgt Date Retire R6 | 7.62 | ~~42.70~~33.45% | 6.05 | ~~40.64~~30.67% |
| MFS Lifetime 2040 I | 6.7~~0~~7 | ~~25.47~~17.34% | 4.8~~0~~8 | ~~11.69~~3.67% |
| MoA Clear Passage 2040 Fund | 6.46 | ~~20.97~~13.13% | 4.75 | ~~10.41~~2.59% |
| T. Rowe Price Retirement 2040 | 6.77 | ~~26.78~~18.56% | 5.3~~0~~3 | ~~23.30~~14.47% |
| Benchmark: Morningstar Lifetime Mod 2040 TR USD | 6.98 | ~~30.71~~22.24% | 4.65 | ~~8.24~~0.43% |

[15] Available at: https://www.pnc.com/insights/corporate institutional/manage-assets/assembling-a-robust-investment-policy-statement-for endowments-foundations.html Last accessed September 5, 2024.

| | | | | |
|---|---|---|---|---|
| **JPMorgan SmartRetirement® 2045 ~~A~~R6** | **5.29~~66~~** | | **4.28~~6~~** | |
| American Funds 2045 Trgt Date Retire R6 | 7.77 | ~~46.88~~37.28% | 6.17 | ~~44.25~~34.13% |
| MFS Lifetime 2045 I | 6.83 | ~~29.11~~20.67% | 4.88 | ~~14.06~~6.09% |
| MoA Clear Passage 2045 Fund | 6.40~~4~~ | ~~20.98~~13.07% | 4.63 | ~~8.36~~0.65% |
| T. Rowe Price Retirement 2045 | 6.81 | ~~28.73~~20.32% | 5.31 | ~~24.28~~15.43% |
| Benchmark: Morningstar Lifetime Mod 2045 TR USD | 7.05 | ~~33.27~~24.56% | 4.60~~6~~ | ~~7.56~~0.00% |
| | | | | |
| **JPMorgan SmartRetirement® 2050 ~~A~~R6** | **5.27~~64~~** | | **4.26~~61~~** | |
| American Funds 2050 Trgt Date Retire R6 | 7.83 | ~~48.51~~38.83% | 6.19 | ~~45.21~~34.27% |
| MFS Lifetime 2050 I | 6.80~~8~~ | ~~29.00~~20.57% | 4.86 | ~~14.03~~5.42% |
| MoA Clear Passage 2050 Fund | 6.33 | ~~20.04~~12.23% | 4.93 | ~~15.54~~6.94% |
| T. Rowe Price Retirement 2050 | 6.80~~8~~ | ~~29.00~~20.57% | 5.32 | ~~24.83~~15.40% |
| Benchmark: Morningstar Lifetime Mod 2050 TR USD | 7.05 | ~~33.72~~25.00% | 4.51 | ~~5.79~~-2.17% |
| | | | | |
| **JPMorgan SmartRetirement® 2055 ~~A~~R6** | **5.29~~66~~** | | **4.29~~61~~** | |
| American Funds 2055 Trgt Date Retire R6 | 7.81 | ~~47.70~~37.99% | 6.17 | ~~43.85~~33.84% |
| MFS Lifetime 2055 I | 6.62 | ~~25.28~~16.96% | 4.76 | ~~10.81~~3.25% |
| MoA Clear Passage 2055 Fund | | | | |
| T. Rowe Price Retirement 2055 | 6.78 | ~~28.21~~19.79% | 5.31 | ~~23.60~~15.18% |
| Benchmark: Morningstar Lifetime Mod 2055 TR USD | 7.04 | ~~33.21~~24.38% | 4.42 | ~~3.07~~-4.12% |
| | | | | |
| **JPMorgan SmartRetirement® 2060 ~~A~~R6** | **N/A** | | **N/A** | |
| American Funds 2060 Trgt Date Retire R6 | N/A | | N/A | |
| MFS Lifetime 2060 I | N/A | | N/A | |
| MoA Clear Passage 2060 Fund | 6.75 | | N/A | |
| T. Rowe Price Retirement 2060 | 7.02 | | N/A | |
| Benchmark: Morningstar Lifetime Mod 2060 TR USD | 7.02 | | 4.34 | |

Formatted: Font color: Black
Formatted: Font color: Black
Formatted: Font color: Black
Formatted: Font color: Black
Formatted: Font color: Black
Formatted: Font color: Black

102.    By 2018, the start of the Class Period, the JPMorgan SmartRetirement R6 Series underperformed the Comparator Funds on average by ~~30.21~~22.64% on a three-year basis and ~~23.26~~14.64% on a five-year basis. In fact, the JPMorgan TDFs underperformed every Comparator Fund for each target date series on a three-year and five-year basis.

103.    Further, by the start of the Class Period in 2018, the JPMorgan SmartRetirement R6 Series underperformed the Morningstar benchmark on average by ~~31.40~~22.68% on a three-

year basis and ~~7.12~~outperformed the Morningstar benchmark on average by only 0.64% on a five-year basis. The chart above demonstrates that the JPMorgan SmartRetirement R6 Series should never have been selected as an investment option for Plan participants and should have been removed prior to the start of the Class Period in 2018.

104.    This trend of underperformance continued throughout the Class Period, until the JPMorgan SmartRetirement R6 Series were finally removed in 2023, which was or should have been apparent to the Plan fiduciaries at the beginning of the Class Period, as the TDFs ~~significantly~~ underperformed the Comparator Funds and Morningstar Index. Yet, the Plan fiduciaries neglected to take action while millions of dollars of retirement savings of the Plan's participants evaporated. These underperformance issues are demonstrated in the chart below.

| Investment and Benchmark | 5 Year Return 1/1/2016-12/31/2020 | JPMorgan TDF % of Under-performance To Comparators | 5 Year Return 1/1/2018 - 12/31/2022 | JPMorgan TDF % of Under-performance To Comparators |
|---|---|---|---|---|
| **JPMorgan SmartRetirement® 2030 ~~A~~R6** | 9.~~36~~76 | | 2.~~77~~23.14 | |
| American Funds 2030 Trgt Date Retire R6 | 11.06 | ~~18.16~~13.32% | 5.09 | ~~86.96%~~62.10% |
| MFS Lifetime 2030 I | 10.37 | ~~10.81~~6.25% | 4.59 | ~~68.58%~~46.18% |
| MoA Clear Passage 2030 Fund | 10.33 | ~~10.39~~5.84% | 4.74 | ~~73.86%~~50.96% |
| T. Rowe Price Retirement 2030 | 11.34 | ~~21.17~~16.19% | 4.63 | ~~70.11%~~47.45% |
| Benchmark: Morningstar Lifetime Mod 2030 TR USD | 10.58 | ~~13.05~~8.40% | 3.54 | ~~29.86%~~12.74% |
| **JPMorgan SmartRetirement® 2035 ~~A~~R6** | 10.~~07~~48 | | 3.~~49~~91 | |
| American Funds 2035 Trgt Date Retire R6 | 12.44 | ~~23.51~~18.70% | 5.88 | ~~68.23~~50.38% |

28

| | | | | |
|---|---|---|---|---|
| MFS Lifetime 2035 I | 11.28 | ~~12.04~~7.63% | 5.57 | ~~59.37~~42.46% |
| MoA Clear Passage 2035 Fund | 10.97 | ~~8.95~~4.68% | 5.20~~2~~ | ~~48.95~~32.99% |
| T. Rowe Price Retirement 2035 | 11.90~~9~~ | ~~18.16~~13.55% | 4.93 | ~~41.04~~26.09% |
| Benchmark: Morningstar Lifetime Mod 2035 TR USD | 11.14 | ~~10.63~~6.30% | 3.97 | ~~13.66~~1.53% |
| **JPMorgan SmartRetirement® 2040 ~~A~~R6** | ~~10.66~~11.07 | | ~~3.93~~4.36 | - |
| American Funds 2040 Trgt Date Retire R6 | 12.99 | ~~21.93~~17.34% | 6.10~~1~~ | ~~55.29~~39.91% |
| MFS Lifetime 2040 I | 11.61 | ~~8.99~~4.88% | 5.85 | ~~48.96~~34.17% |
| MoA Clear Passage 2040 Fund | 11.20~~2~~ | ~~5.11~~1.17% | 5.65 | ~~43.84~~29.59% |
| T. Rowe Price Retirement 2040 | 12.38 | ~~16.20~~11.83% | 5.20~~2~~ | ~~32.39~~19.27% |
| Benchmark: Morningstar Lifetime Mod 2040 TR USD | 11.48 | ~~7.75~~3.70% | 4.36 | ~~1~~10.00% |
| **JPMorgan SmartRetirement® 2045 ~~A~~R6** | ~~10.85~~11.27 | | ~~4.27~~71 | - |
| American Funds 2045 Trgt Date Retire R6 | 13.22 | ~~21.86~~17.30% | 6.11 | ~~43.15~~29.72% |
| MFS Lifetime 2045 I | 11.86 | ~~9.36~~5.24% | 6.08 | ~~42.2~~9.09% |
| MoA Clear Passage 2045 Fund | 11.19 | ~~3.15~~-0.71% | 5.66 | ~~32.63~~20.17% |
| T. Rowe Price Retirement 2045 | 12.63 | ~~16.46~~12.07% | 5.45 | ~~27.58~~15.71% |
| Benchmark: Morningstar Lifetime Mod 2045 TR USD | 11.61 | ~~7.01~~3.02% | 4.58 | ~~7.25~~-2.76% |
| **JPMorgan SmartRetirement® 2050 ~~A~~R6** | ~~10.83~~11.24 | | ~~4.23~~66 | - |
| American Funds 2050 Trgt Date Retire R6 | 13.36 | ~~23.38~~18.86% | 6.04 | ~~42.67~~29.61% |
| MFS Lifetime 2050 I | 11.83 | ~~9.20~~5.25% | 6.07 | ~~43.41~~30.26% |

Formatted: Right
Formatted: Right
Formatted: Right
Formatted: Font color: Black
Formatted: Right
Formatted: Font: Calibri
Formatted: Left
Formatted: Font color: Black
Formatted: Font: Calibri
Formatted: Left
Formatted: Font color: Black
Formatted: Font: Calibri
Formatted: Left

| | | | | |
|---|---|---|---|---|
| MoA Clear Passage 2050 Fund | 11.18 | ~~3.26~~ -0.53% | 5.62 | ~~32.83~~20.60% |
| T. Rowe Price Retirement 2050 | 12.62 | ~~16.55~~12.28% | 5.45 | ~~28.79~~16.95% |
| Benchmark: Morningstar Lifetime Mod 2050 TR USD | 11.62 | ~~7.28~~3.38% | 4.62 | ~~9.13~~-0.86% |
| | | | - | - |
| **JPMorgan SmartRetirement® 2055 ~~~~R6** | ~~10.85~~11.26 | | **~~4.26~~7** | |
| American Funds 2055 Trgt Date Retire R6 | 13.35 | ~~23.09~~18.56% | 5.87 | ~~37.77~~24.89% |
| MFS Lifetime 2055 I | 11.72 | ~~8.04~~4.09% | 6.09 | ~~42.75~~29.57% |
| MoA Clear Passage 2055 Fund | | | 5.67 | ~~32.96~~20.64% |
| T. Rowe Price Retirement 2055 | 12.59 | ~~16.09~~11.81% | 5.40~~4~~ | ~~26.65~~14.89% |
| Benchmark: Morningstar Lifetime Mod 2055 TR USD | 11.61 | ~~7.01~~3.11% | 4.55 | ~~6.82~~-3.19% |
| | | | - | - |
| **JPMorgan SmartRetirement® 2060 ~~~~R6** | N/A | | **~~4.29~~72** | |
| American Funds 2060 Trgt Date Retire R6 | 13.35 | N/A | 5.82 | ~~35.49~~23.31% |
| MFS Lifetime 2060 I | N/A | N/A | 6.11 | ~~42.48~~29.45% |
| MoA Clear Passage 2060 Fund | N/A | N/A | N/A | N/A |
| T. Rowe Price Retirement 2060 | 12.56 | N/A | 5.40~~4~~ | ~~25.91%~~ 14.41% |
| Benchmark: Morningstar Lifetime Mod 2060 TR USD | 11.57 | N/A | 4.46 | ~~4.00%~~ -5.51% |

Formatted: Font color: Auto
Formatted: Font color: Black
Formatted: Font: Calibri
Formatted: Left

Formatted: Font color: Auto
Formatted: Font color: Black
Formatted: Font: Calibri
Formatted: Left

Formatted: Font color: Black

Formatted: Font color: Auto

Formatted: Font color: Dark Red
Formatted: Font color: Black
Formatted: Line spacing: single

105.    By the end of 2020, the JPMorgan SmartRetirement R6 Series underperformed the Comparator Funds on average by ~~20.28% on a three-year basis and 13.87~~9.81% on a five-year basis. By the end of 2022, the JPMorgan SmartRetirement R6 Series underperformed the Comparator Funds on average by 30.77% on a five-year basis.

106.   Further, by the end of 2020, the JPMorgan SmartRetirement R6 Series underperformed the Morningstar benchmark on average by ~~5.62~~4.65% on a ~~three~~five-year basis. By the end of 2022, the JPMorgan SmartRetirement R6 Series underperformed the Morningstar benchmark on average by and ~~8.79~~0.28% on a five-year basis.

107.   To make matters worse, the JPMorgan SmartRetirement R6 Series continuously ranked poorly as compared to its peers in its Morningstar Category.

| Investment | Percentile Rank 3-Year Return Ending 2018 | Percentile Rank 5-year Return Ending 2018 | Percentile Rank 5-year Return Ending 2020 | Percentile Rank 5-year Return Ending 2022 |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2030 ~~A~~R6 | ~~78th~~64th | ~~40th~~66th | ~~81st~~64th | ~~85th~~95th |
| JPMorgan SmartRetirement 2035 ~~A~~R6 | ~~84th~~73rd | ~~48th~~69th | ~~66th~~80th | ~~70th~~90th |
| JPMorgan SmartRetirement 2040 ~~A~~R6 | ~~81st~~66th | ~~69th~~50th | ~~56th~~74th | ~~69th~~85th |
| JPMorgan SmartRetirement 2045 ~~A~~R6 | ~~74th~~86th | ~~51st~~70th | ~~79th~~59th | ~~86th~~63rd |
| JPMorgan SmartRetirement 2050 ~~A~~R6 | ~~88th~~76th | ~~54th~~71st | ~~83rd~~63rd | ~~71st~~84th |
| JPMorgan SmartRetirement ~~2055A~~2055 R6 | ~~88th~~76th | ~~69th~~52nd | ~~86th~~68th | ~~87th~~73rd |
| JPMorgan SmartRetirement 2060 ~~A~~R6 | N/A | N/A | N/A | ~~85th~~72nd |

**Formatted:** Line spacing: single

108.   Despite this information being available at the start of the Class Period, and every year during the Class Period, the funds were not replaced until the losses had already been baked in.

109.   There's no justifiable excuse for having allowed the JPMorgan SmartRetirement R6 Series to be selected as investment options for Plan participants or to languish in the Plan without taking any action. This issue has nothing to do with any differences in the purpose of the Series or any possible justifiable difference in investment strategy, it's simply evidence of a clearly flawed investment strategy.

110.    The continued inclusion of the JPMorgan SmartRetirement R6 Series was in clear violation of the Plan's own IPS. As stated in the IPS, funds must be selected and maintained in the Plan by looking at its "investment results relative to a relevant benchmark index and/or relative to an appropriately defined peer group." IPS at 3. Here, the JPMorgan SmartRetirement R6 Series clearly fell well below the appropriate index and peer group.

111.    Accordingly, a prudent fiduciary would have removed the JPMorgan SmartRetirement R6 Series from the Plan as early as the start of the Class Period and replaced with one of the many stable and better performing TDFs available to the Plan.

2.    The Fees Associated with the JPMorgan TDFs Were Unreasonable Compared to Fees of the Prudent Investment Alternatives

112.    As noted above, under ERISA, a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

113.    Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

114.    On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones with over a $1 billion in assets managed, lead to economies of scale and special pricing within mutual funds.

~~115.   Further, "The Restatement … instructs that 'cost conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble II*, 843 F.3d at 1197-98.~~

~~116.   As represented above, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees…lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").~~

~~117.   Each of the Target Date year funds had an expense ratio at or in excess of .75%. Compared to the Comparator Funds, this cost was higher than the Comparator Funds, while the JPMorgan TDFs performed worse than the Comparator Funds. The chart below utilizes 2024 expense ratio figures from Morningstar as an exemplar year to demonstrate the discrepancy in expenses. The degree of the discrepancy in fees between the JPMorgan TDFs and Comparator Funds were similar from 2018 through 2021. Thus, investment in the JPMorgan TDFs cost Plan participants monetary losses that will impact them over their lifetime:~~

| ~~Fund in Plan~~ | ~~2024 Exp. Ratio~~ | ~~Peer Group Funds~~ | ~~2024 Exp. Ratio~~ | ~~Investment Style~~ | ~~% Fee Excess~~ |
|---|---|---|---|---|---|
| ~~JPMorgan SmartRetirement 2020 A~~ | ~~0.75%~~ | ~~American Funds 2020 Trgt Date Retire R6~~ | ~~0.31%~~ | ~~Target date~~ | ~~142%~~ |
| | | ~~MFS Lifetime 2020 I~~ | ~~0.47%~~ | | ~~60%~~ |
| | | ~~MoA Clear Passage 2020 Fund~~ | ~~0.45%~~ | | ~~67%~~ |
| | | ~~T. Rowe Price Retirement 2020~~ | ~~0.53%~~ | | ~~42%~~ |
| ~~JPMorgan SmartRetirement 2025 A~~ | ~~0.78%~~ | ~~American Funds 2025 Trgt Date Retire R6~~ | ~~0.32%~~ | ~~Target date~~ | ~~144%~~ |
| | | ~~MFS Lifetime 2025 I~~ | ~~0.47%~~ | | ~~66%~~ |
| | | ~~MoA Clear Passage 2025 Fund~~ | ~~0.41%~~ | | ~~90%~~ |
| | | ~~T. Rowe Price Retirement 2025~~ | ~~0.54%~~ | | ~~44%~~ |
| ~~JPMorgan SmartRetirement 2030 A~~ | ~~0.79%~~ | ~~American Funds 2030 Trgt Date Retire R6~~ | ~~0.33%~~ | ~~Target date~~ | ~~139%~~ |
| | | ~~MFS Lifetime 2030 I~~ | ~~0.51%~~ | | ~~55%~~ |
| | | ~~MoA Clear Passage 2030 Fund~~ | ~~0.39%~~ | | ~~103%~~ |
| | | ~~T. Rowe Price Retirement 2030~~ | ~~0.57%~~ | | ~~39%~~ |
| ~~JPMorgan SmartRetirement 2035 A~~ | ~~0.83%~~ | ~~American Funds 2035 Trgt Date Retire R6~~ | ~~0.35%~~ | | ~~126%~~ |

33

| | | | | |
|---|---|---|---|---|
| | | MFS Lifetime 2035 I | 0.55% | Target date | 51% |
| | | MoA Clear Passage 2035 Fund | 0.36% | | 131% |
| | | T. Rowe Price Retirement 2035 | 0.59% | | 41% |
| JPMorgan SmartRetirement 2040 A | 0.84% | American Funds 2040 Trgt Date Retire R6 | 0.37% | Target date | 127% |
| | | MFS Lifetime 2040 I | 0.57% | | 47% |
| | | MoA Clear Passage 2040 Fund | 0.34% | | 147% |
| | | T. Rowe Price Retirement 2040 | 0.60% | | 40% |
| JPMorgan SmartRetirement 2045 A | 0.85% | American Funds 2045 Trgt Date Retire R6 | 0.37% | Target date | 130% |
| | | MFS Lifetime 2045 I | 0.58% | | 47% |
| | | MoA Clear Passage 2045 Fund | 0.33% | | 158% |
| | | T. Rowe Price Retirement 2045 | 0.62% | | 37% |
| JPMorgan SmartRetirement 2050 A | 0.85% | American Funds 2050 Trgt Date Retire R6 | 0.38% | Target date | 124% |
| | | MFS Lifetime 2050 I | 0.58% | | 47% |
| | | MoA Clear Passage 2050 Fund | 0.34% | | 150% |
| | | T. Rowe Price Retirement 2050 | 0.63% | | 35% |
| JPMorgan SmartRetirement 2055A | 0.85% | American Funds 2055 Trgt Date Retire R6 | 0.38% | Target date | 124% |
| | | MFS Lifetime 2055 I | 0.58% | | 47% |
| | | MoA Clear Passage 2055 Fund | 0.37% | | 130% |
| | | T. Rowe Price Retirement 2055 | 0.64% | | 33% |
| JPMorgan SmartRetirement 2060 A | 0.84% | American Funds 2060 Trgt Date Retire R6 | 0.39% | Target date | 115% |
| | | MFS Lifetime 2060 I | 0.57% | | 47% |
| | | MoA Clear Passage 2060 Fund | 0.40% | | 110% |
| | | T. Rowe Price Retirement 2060 | 0.64% | | 31% |

118.    On average, the expense ratios for JPMorgan TDFs in the Plan were up to 85% above the expense ratios for the Comparator Funds and 39% above the Morningstar median expense ratios of all funds in the same category:

| Investment | Expense Ratio | Peer Group Median Expense Ratio | % Fee Excess |
|---|---|---|---|
| JPMorgan SmartRetirement 2030 A | 0.79% | 0.60% | 32% |
| JPMorgan SmartRetirement 2035 A | 0.83% | 0.60% | 38% |
| JPMorgan SmartRetirement 2040 A | 0.84% | 0.64% | 31% |
| JPMorgan SmartRetirement 2045 A | 0.85% | 0.63% | 35% |
| JPMorgan SmartRetirement 2050 A | 0.85% | 0.64% | 33% |
| JPMorgan SmartRetirement 2055A | 0.85% | 0.65% | 31% |
| JPMorgan SmartRetirement 2060 A | 0.84% | 0.64% | 31% |

119.    Had the Plan fiduciaries conducted an impartial review of the Plan's investments they would have easily noticed the JPMorgan TDFs were far more expensive than Comparator funds and the Morningstar benchmarks.

34

**B.  C.  The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Appropriately Monitor the Fees Paid by the Plan in a Prudent Manner**

120.112.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[16]

**ERISA's Fee Disclosure Rule**

121.113.    In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [17]

122.114.    The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

123.115.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these

---

[16] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

[17] *See* *https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

---

**Formatted:** Indent: Left:  0.5", Hanging:  0.5"

obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

124.116. The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

125.117. A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

126.118. Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

### B. D. Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants

127.119. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

128.120. Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers. Numerous recordkeepers in the

marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan.

129.121.    There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include the following services:

    **A.** Basic account recordkeeping (*e.g.* demographic, source, investment and vesting records);

    **B.** Multi-channel participant and plan sponsor access (*e.g.* phone, web);

    **C.** Daily participant transaction accounting (*e.g.* purchases, redemptions, exchanges);

    **D.** Payroll service (*e.g.* hardships, in-service withdrawals, termination distributions);

    **E.** Participant tax reporting services (*e.g.* IRS Form 1099-R);

    **F.** Participant confirmations, statements, and standard notices;

    **G.** Plan-level reporting and annual financial package (excluding IRS Form 5500);

    **H.** Participant education (*e.g.* newsletters, web articles, standard communication materials);

    **I.** Plan consulting (*e.g.*, preapproved document services, operational materials);

    **J.** Plan consulting (*e.g.* preapproved document services, operational compliance support).

130.122.    These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. Ancillary services such as QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services.

131.123.    The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. Recordkeepers for large 403(b) and 401(k) plans such as Empower, Voya, Vanguard and Fidelity, among others, invest in technology

infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services). The costs of using this technology does not materially change if the recordkeeper gains a new plan or loses an existing plan, and don't vary based on the amount of assets in the plan or in an individual's account.

~~132.~~124.      The Plan's recordkeeping agreement was requested from the Plan fiduciaries on October 18, 2022, but that request was denied on November 17, 2022. However, attached is a sample Fidelity recordkeeping agreement at Appendix "A" ("Sample Agreement"). A review of the Sample Agreement reveals that the services listed are all for standard services for account recordkeeping, participant access to their accounts, transaction accounting, payroll services tax reporting services, account statements, financial reporting, participant education and plan consulting for operational materials and compliance. *Id*.

~~133.~~125.      The Plan's 2022 Participant Disclosure reveals that additional services, such as Personalized Planning & Advice and in service withdrawal fees are charged separately to individual participants using the services. *See* 2022 Participant Disclosure at 4-5.

~~134.~~126.      The cost of providing recordkeeping services often depends on the number of participants in a plan.  In other words, most of the cost of recordkeeping and administration of a 403(b) and 401(k) plan is directly linked to the number of participant accounts within the plan rather than the amount of assets in a participant's account. Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

~~135.~~127.      The way it works in part, is that each participant's account incurs transactions such as contributions, distributions, asset allocation changes, and less frequently, loans and distributions and participant reports. Each participant's account balance is updated daily, reflecting the aforementioned activities as well as investment returns.  In this manner a

38

participant's account is somewhat similar to a simplified brokerage account with only a few investment positions. As a result, the cost of recordkeeping for a participant's account with a balance of $500,000 is the same as for a participant whose account balance is $5,000 in the same plan.

~~136.~~128.     When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increase, the average cost per participant decreases. *See,* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases." [18] ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.[19]***

~~137.~~129.     Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

~~138.~~130.     Although participant servicing for 403(b) plans can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan.  Accordingly, a plan sponsor or

---

[18] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

[19] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan."  There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets."  Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

131.     Recordkeeping and annual account administration add no monetary value to the account and act solely as a necessary expense decreasing investment returns.  There is no rational economic reason for the record keeper, or account administrator to receive increased revenues simply based upon increased investment returns, and increased account balances, or employee additional retirement savings' contributions.

132.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

133.     Here, the Plan's recordkeeper Fidelity, as of 2022, set a per participant recordkeeping fee of $40 per participant. Accordingly, Fidelity will issue a bill to the Plan by multiplying the number of participants by $40. This bill is paid for using the Plan's assets either through revenue sharing or by simply utilizing available Plan assets. *See* 2022 Participant Disclosure at 5.

134.     While Memorial Hermann's 401(k) Plan was significantly smaller in size, in terms of both assets and participants, it also adopted a $40 per participant recordkeeping fee paid to Fidelity in 2022. *See* MHHS 401k Participant Disclosure Notice, dated October 10, 2022.

135.     By the end of 2023, the Plan had 30,691 participants with account balances $2,784,471,411 in assets. *See* 2023 Form 5500 for the Plan. In the same year, the 401(k) Plan had 3,229 participants and $98,825,206 in assets. *See* 2023 Form 5500 for the MHHS 401(K)

40

Retirement Savings Plan and Trust. Fidelity was making a combined $80 per participant off of these plans.

144.136.     As discussed above, Fidelity also charges investment fees (expense ratios) for Fidelity's proprietary products in the Plans. *See* 2022 Participant Disclosure at 12-13, 21. This fee is based on a percentage of the assets invested. *Id*. at 12-15. Meaning, as the Plan's amounts invested in Fidelity products increased, so did the amount of fees Fidelity was receiving for those products.

C.     E.     **Much of the Information Regarding the Reasonableness of Fees for Recordkeeping Services Are in the Sole Possession of Defendants**

| Formatted: Normal, Indent: Left: 0.5", Hanging: 0.5", No bullets or numbering |

145.137.     As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants. The same is true for Plaintiffs and the Plan, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

146.138.     A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

147.139.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years."  These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[20]

148.140.    Generally, any RFPs, if conducted, would not be made available to plan participants.  The same is true for Plaintiffs here who do not have direct access to such information and must therefore look at circumstantial evidence showing whether or not an RFP took place in this case.

149.141.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes regarding the monitoring of recordkeeping fees based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

**D.  F.    Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to RKA Fees**

150.142.    During the Class Period, Fidelity was one of the top recordkeepers nationally as measured by assets being recordkept.  For example, in 2020 Fidelity ranked as follows:

**2020 TOP PROVIDERS (RECORDKEEPERS)[21]**
**Top 10, by Total 401(k) Assets ($MM)**

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |

---

[20] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/
[21] *See* https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/

| | | |
|---|---|---|
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

**Formatted:** Line spacing:  single

~~151.~~143.     The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k)/403(b) service provider arena.

      **1.    There is No Indication Defendants Negotiated to Reduce the Plan's Recordkeeping Fees During the Class Period**

~~152.~~144.     As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either.  Accordingly, as noted above, the best way for a plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

~~153.~~145.     The fact that the Plan paid astronomical amounts for recordkeeping during the Class Period while keeping the same recordkeeper indicates that Defendants failed to conduct a RFP at reasonable intervals – or even an effective, prudent one - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

~~154.~~146.     At any point in the Class Period, the Plan's fiduciaries could have opted to conduct a RFP to any recordkeeper including any of the above top ten recordkeepers who were peers of Fidelity and capable of providing lower recordkeeping fees.  Had Defendants sought an appropriate market rate through an RFP, it's likely either the recordkeeper would have been

changed at some point or Fidelity would have agreed to pay its own admitted reasonable rate of $14-$21 per participant or less (discussed below) throughout the Class Period.

155.147.    Another commonly used negotiation tactic for lowering recordkeeping fees is to leverage the plan's use of the recordkeeper's proprietary products.

156.148.    As discussed, the Plan had hundreds of millions of dollars invested in Fidelity products, for which Fidelity charged a fee, and Memorial Hermann was also paying Fidelity to recordkeep its' other retirement plan, the 401(k) plan. Yet, despite this repeat business Fidelity was getting from Memorial Hermann, the Plan's fiduciaries failed to achieve a proprietary discount for recordkeeping services, or at least failed to achieve enough of a discount to bring the Plan's fees in line with similarly situated plans.

157.149.    Apart from failing to reduce the Plan's recordkeeping fees through a RFP and leveraging the Plan' use of Fidelity for other products and services, the evidence also indicates the Plan's fiduciaries failed to leverage the Plan's massive size to negotiate lower recordkeeping fees.

158.150.    Any decrease in fees experienced by the Plan paled in comparison to what decrease would have resulted from the fiduciaries leveraging the Plan's growing participant size appropriately. For example, in 2020 the fees decreased by less than one percent while the participant size grew by almost 3%. The Plan's recordkeeping fees were as follows:

44

| Year | Participants | Percent Increase In Participants | Hard Dollar Payments[23] | Indirect Payments | Total | Fees PP | Percent Decrease In Fees |
|------|-------------|-------------------------------|--------------------------|-------------------|-------|---------|-------------------------|
| 2018 | 25,122 | | $1,171,499.00 | $54,237.00 | $1,225,736.00 | $48.79 | |
| 2019 | 26,711 | 6.32% | $1,184,160.00 | $63,535.00 | $1,247,695.00 | $46.71 | 4.26% |
| 2020 | 27,510 | 2.99% | $1,213,291.00 | $61,899.00 | $1,275,190.00 | $46.35 | 0.77% |
| 2021 | 29,105 | 5.80% | $1,232,320.00 | $77,180.00 | $1,309,500.00 | $44.99 | 2.93% |
| 2022 | 30,691 | 5.45% | $1,227,640.00 | N/A | $1,227,640 | $40.00 | 11.09% |
| 2023 | 33,226 | 8.26% | $1,329,040.00 | N/A | $1,329,040 | $40.00 | 0% |

159.151.    Even with the inadequate reductions in the beginning of the Class Period, these rates exceeded, by far, the reasonable rate for a plan size of the Plan. Worse yet, toward the end of the Class Period, the number of Plan participants increased and the Plan's services stayed the same, but there was no decrease in the Plan's recordkeeping fees.

**2.    3.    The Plan's Recordkeeping Fees were/are Unreasonable When Benchmarked Against Other Similarly Situated Plans and Within the Context that Plan Recordkeeping Fees Should Decline as Plan Size Increases**

160.152.    At all times during the Class Period a per participant fee of at least $40 was unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases." Accordingly, the larger the plan, the lower the recordkeeping fee should be.

---

[22] Even if deriving the recordkeeping fees from the direct, hard dollar payments alone, the totals would be: $46.63 in 2018, $44.33 in 2019, $44.10 in 2020, and $42.34 in 2021. Hence, direct payments alone were excessive before the additional indirect payments.

~~161.~~153.      To put things into perspective, when comparing retirement plan data, most publications utilize tranches.  For example, the leading publication that collects 403(b) data is BrightScope/ICI.  *See* fn. 4.  It categorizes plans in the following tranches:

~~162.~~154.      *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2020 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2023-04/23-ppr-dcplan-profile-403b.pdf.  Accordingly, the billion-dollar mark for assets under management ("AUM") is significant as all plans holding over a billion dollars are considered in a tier of their own. This tier accounts for less than 0.71% of all 403(b) plans in the DOL universe.

---

EXHIBIT I.4

**Audited ERISA 403(b) Plans and the Universe of ERISA 403(b) Plans by Plan Assets**
Distribution of 403(b) plans, participants, and assets by plan assets; 2020

| | BrightScope audited 403(b) filings | | | Department of Labor 403(b) universe | | |
|---|---|---|---|---|---|---|
| **Plan assets** | **Plans** | **Participants Thousands** | **Assets Billions of dollars** | **Plans** | **Participants Thousands** | **Assets Billions of dollars** |
| Less than $1M | 191 | 35.8 | $0.1 | 6,659 | 179.0 | $2.4 |
| $1M to $10M | 2,520 | 602.2 | 12.3 | 7,394 | 876.3 | 26.7 |
| >$10M to $50M | 2,149 | 884.4 | 50.6 | 2,436 | 921.6 | 54.9 |
| >$50M to $100M | 568 | 439.3 | 40.4 | 574 | 441.9 | 40.8 |
| >$100M to $250M | 450 | 667.5 | 70.6 | 457 | 679.1 | 71.7 |
| >$250M to $500M | 201 | 684.9 | 70.7 | 203 | 698.6 | 71.4 |
| >$500M to $1B | 127 | 840.2 | 88.1 | 130 | 855.1 | 90.2 |
| More than $1B | 125 | 2,092.4 | 308.6 | 127 | 2,120.0 | 312.2 |
| All plans | 6,331 | 6,246.8 | 641.4 | 17,980 | 6,771.6 | 670.3 |

Note: Audited 403(b) filings generally include plans with 100 participants or more. Assets are fair market value at the year-end of the plan and include loans.
Source: BrightScope Defined Contribution Plan Database

---

~~163.~~155.      The comparisons below demonstrate the unreasonably high Plan fees when looking at the fees of the Plan's peers:

| **2018**[23] | | | |
|---|---|---|---|

---

[23] Unless otherwise noted, in order to keep this comparator analysis consistent with the MHHS analysis above, the costs in the chart are derived, in the same manner as for MHHS, from Schedule C of the Form 5500s or explicitly listed in the form's auditor's report section. The fees reflect fees paid to service providers with service codes that signify recordkeeping, codes such as 13, 14, 15, 16, 37, 50, 60, 62, 64 and 65 are some examples, but are not limited to, these codes. See Instructions for Form 5500 (2020) at pg. 27 (defining each service code), https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-

| Plan Name | Participants | AUM | Fees |
|---|---|---|---|
| Sanofi U.S. Group Savings Plan | 24,097 | $5,552,720,874 | $23 |
| Deseret 401(k) Plan | 34,938 | $3,381,868,127 | $20 |
| Memorial Hermann | 25,122 | $1,375,943,878 | $48.79 |

| **2019** | | | |
|---|---|---|---|
| **Plan** | **Participants** | **AUM** | **Fees** |
| Deseret 401(k) Plan | 34,938 | $4,264,113,298 | $22[24] |
| The Dow Chemical Company Employees' Savings Plan* | 37,868 | $10,913,979,302 | $25 |
| Memorial Hermann | 26,711 | $1,769,757,452 | $46.71 |

| **2020** | | | |
|---|---|---|---|
| **Plan** | **Participants** | **AUM** | **Fees** |
| Farmers Group, Inc. 401(k) Savings Plan | 26,826 | $4,102,361,526 | $35 |
| Philips North America 401(k) Plan | 28, 348 | $5,663,746,665 | $23 |
| Chevron Employee Savings Investment Plan | 33,484 | $17,372,888,796 | $26[25] |
| Memorial Hermann | 27,510 | $2,020,073,237 | $46.35 |

| **2021** | | | |
|---|---|---|---|
| **Plan** | **Participants** | **AUM** | **Fees** |
| Philips North America 401(k) Plan | 30,245 | $6,384,324,582 | $23 |
| Hewlett Packard Enterprise 401(k) Plan* | 31, 423 | $9,201,380,013 | $34 |
| Beaumont Health 403(b) Plan | 33,484 | $2,643,820,272 | $28[26] |

compliance/reporting-and-filing/form-5500/2020-instructions.pdf at 27. In addition, the comparator plans chosen are plans that have little to no revenue sharing and it's for this reason that revenue sharing from a plan's funds are not added to per participant amounts.

[24] See the Deseret 401(k) Plan, Summary Plan Description dated March 27, 2018 at pg. 22 attached hereto as Appendix "B."

[25] See the 2020 Summary Plan Description for the Chevron Employees Savings Investment Plan attached hereto as Appendix "C."

[26] See, the 2021 404(a) Fee Disclosure for the Beaumont Health 403(b) Plan at pg. 5 attached hereto as Appendix "D."

| Publicis Benefits Connection 401k Plan | 48,148 | $4,306,524,438 | $27[27] |
|---|---|---|---|
| Memorial Hermann | 29,105 | $2,467,879,011 | $44.99 |

| **2022** | | | |
|---|---|---|---|
| **Plan** | **Participants** | **AUM** | **Fees** |
| Relx, Inc US Salary Investment Plan | 19,465 | $3,016,505,434 | $25 |
| Philips North America 401(k) Plan | 30,811 | $5,170,841,621 | $23 |
| Deseret 401(k) Plan | 37,570 | $4,664,327,790 | $20 |
| Memorial Hermann | 30,691 | $2,201,736,460 | $40 |

| **2023** | | | |
|---|---|---|---|
| **Plan** | **Participants** | **AUM** | **Fees** |
| Philips North America 401(k) Plan | 30,810 | $5,779,286,156 | $13 |
| Deseret 401(k) Plan | 37,570 | $5,481,729,272 | $20 |
| Memorial Hermann | 33,226 | $2,784,471,411 | $40 |

* Denotes plans using Fidelity as their recordkeeper.

164.156.    The average of fees paid by the comparator plans in the above chart is $24.19 per participant per year, well below what the Plan was paying throughout the Class Period.

165.157.    Dating back to 2018, the Plan's recordkeeping fees remained among the highest for billion-dollar plans while consistently having some of the largest numbers of Plan participants, an aspect of the Plan that should have commanded much lower fees. As a point of emphasis, in 2020, there were only 194 defined contribution plans (401k, 401a, and 403b) in the country with 20,000 to 29,999 participants with account balances. (*see supra* ¶ 10) meaning the Plan fiduciaries had tremendous bargaining power.

166.158.    Viewing the fee history of the Philips North America 401(k) Plan (the "Philips Plan") in the above chart highlights the effectiveness of competitive bidding, such as RFPs

48

and prudent negotiations. In the 2020 Form 5500 for the Philips Plan, the auditor's notes state as

follows:

> "In 2020, and for the period from May 1, 2019 to December 31, 2019 an annual
> recordkeeping fee of $23 was charged to each participant's account on a periodic
> basis to pay for Prudential's administrative services. An annual recordkeeping fee
> of $33 was charged to each participant's account on a periodic basis to pay for
> Vanguard's administrative services for the period January 1, 2019 to April 30,
> 2019."

*Id*. at 38 (Auditors Report, at ¶7).

167.159.    In other words, the Philips Plan lowered recordkeeping fees by more than

30% through exploring the market and switching recordkeepers. Even without committing to a

switch in recordkeepers, the information from competing recordkeepers' bids is a powerful

negotiating tool.

168.160.    The Philips Plan is also a meaningful comparison because it has a similar

participant count to the Plan. In 2020, the Philips Plan had 28,348 participants while the Plan had

27,510 participants. *Id*. at 2. In 2021 the Philips Plan had 30,245 participants while the Memorial

Hermann Plan had 29,105 participants. *See* Philips Plan Form 5500 for 2021. In 2021, the Philips

Plan was still paying $23 in recordkeeping fees. *Id*. at 39 (Auditors Report, at ¶7). Despite their

similar plan size, Phillips was paying less than half of what the Plan was paying in 2020 and 2021.

169.161.    In 2023, the Philips Plan stayed with the same recordkeeper, and obtained

a decrease in fees by $10, from $23 to $13 (43.48%), although participant size stayed roughly the

same. *See* Philips Plan Form 5500 for 2023. However, in the year before, the Plan only experienced

a 11.09% decrease in fees, from $44.99 to $40, even though the participant count increased. It is

implausible that any due diligence was undertaken by the fiduciaries in reevaluating their fees with

Fidelity.

**3.    4.The Plan's Recordkeeping Fees Are Unreasonable When Compared
to the Lower Recordkeeping Fees for Similar Services Performed by**

> **Formatted:** Indent: Left:  1", Hanging:
> 0.5", Right:  0", Numbered + Level: 1 +
> Numbering Style: 1, 2, 3, … + Start at: 1
> + Alignment: Left + Aligned at:  1" +
> Indent at:  1.25"

**Fidelity for Similarly Situated Plans and Plans with Less Bargaining Power than the Plan**

~~170.~~162.          The final factor indicating the Plan overpaid for recordkeeping fees during the Class Period is based on the fact that Fidelity charges, and has charged, lower recordkeeping fees to other plans, either smaller or similar in size to the Plan in terms of the number of participants (and thus plans with less bargaining power than the Plan), for the same routine recordkeeping services it offered to the Plan.

~~171.~~163.          The chart in ¶164, *supra*, shows several similar sized plans using Fidelity as their recordkeeper and paying lower fees.  Using that same analysis, there are several more Fidelity recordkept plans who are significantly smaller than the Plan yet paying less in fees. For example, in 2019 the First American Financial Corporation 401(K) Savings Plan had 15,246 participants while paying $35 in fees, the Tax Sheltered Annuity Plan of Texas Children's Hospital had 14,676 participants while paying $37 in fees, and the Fortive Retirement Savings Plan had 14,375 participants while paying $38 in fees. That same year, the Plan had 26,711 participants and was paying $46.71 in fees.

~~172.~~164.          In a recent lawsuit where Fidelity's own multi-billion dollar plan with at least 58,000 participants was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."  *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

173.165.    Fidelity itself defines the relevant marketplace as all plans with over a billion dollars in assets having their own tier, thus confirming the meaningfulness of the billion-dollar asset marker as used herein.

174.166.    Fidelity stipulated as follows:

> "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that *Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year*. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period* (**November 18, 2014 to the present**)."

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

175.167.    The significance of the Fidelity stipulation is that the Plan was in the over $1 billion in assets tiering for recordkeeping pricing, but was paying significantly more than $14-21 per participant per year. In 2021 for example, the Plan was over half the size of the Fidelity Plan (29,105 and 58,000 participants respectively), but the Plan was paying more than three times what it could have achieved had it "negotiated a fixed fee for recordkeeping services at arm's length with Fidelity" for the same "services received by any other Fidelity-recordkept plan with at least $1 billion in assets." *Id*.

176.168.    Indeed, the chart in ¶159 *supra* shows numerous plans with more than $1 billion in assets paying significantly lower fees to Fidelity than the Plan despite a similar participant size. Even if those plans had extra factors driving up the recordkeeping fees that were not part of the Fidelity Stipulation, they were still paying less than the Plan.

51

177.169.    Given the trend of diminishing recordkeeping fees over the last few years (and as borne out by the diminishing fees described in the Fidelity stipulation and the other plans cited in this complaint), the value of the recordkeeping services provided to the Plan by Fidelity would likely be less than $14 per participant at present, and less than the average taken of plans for the whole Class Period.

178.170.    The Plan should have been able to obtain per participant recordkeeping fees less than half of what it paid, and as low as $17 (being the number Fidelity stipulated to as the *highest* reasonable fee) per participant based on its immense size and the routine nature of the recordkeeping services performed by Fidelity.  As noted above, Fidelity largely offers the same services to its clients. Any services beyond the routine are billed on top of the core charges to individual participants separately.  This fee range is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

**Formatted:** Normal, Indent: Left: 0"

179.171.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

180.172.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

181.173.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries,

52

and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

~~182.~~174.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as failing to select prudent investment options or failing to replace investment options when they became imprudent.

~~183.~~175.    The failure to engage in an appropriate and prudent process resulted in saddling the Plan and its participants with imprudent investment options that cost the Plan's participants potential retirement benefits.

~~184.~~176.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to investment return damages.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

~~185.~~177.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

~~186.~~178.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against MHHS and the Board Defendants)**

Formatted: Indent: Left: 0"

~~187.~~179.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

~~188.~~180.    MHHS and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Prudence Defendants and were aware that the Prudence Defendants had critical responsibilities as fiduciaries of the Plan.

~~189.~~181.    In light of this authority, the Monitoring Defendants had a duty to monitor the Prudence Defendants to ensure that the Prudence Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Prudence Defendants were not fulfilling those duties.

~~190.~~182.    The Monitoring Defendants also had a duty to ensure that the Prudence Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

~~191.~~183.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

        (a)    Failing to monitor and evaluate the performance of the Prudence Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Prudence Defendants' imprudent actions and omissions;

54

(b)     failing to monitor the processes by which the Plan's investments were evaluated; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent and poorly performing investments within the Plan all to the detriment of the Plan and Plan's participants' retirement savings.

~~192.~~184.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

~~193.~~185.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Prudence Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of the Plan's fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: ~~October 30, 2024~~ January ___, 2025          **CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(Admitted Pro Hac Vice)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
Telephone: (610) 890-0200
Fax: (717) 233-4103


**KELL A. SIMON LAW OFFICES**

*/s/ Kell A. Simon, Esquire*
TX Atty. Bar #24060888
THE LAW OFFICES OF KELL A. SIMON
501 North IH-35, Suite 111
Austin, Texas 78702
(512) 898-9662 Telephone
(512) 368-9144 Facsimile
E-mail: Kell@kellsimonlaw.com


*Counsel for Plaintiffs and the Putative Class*

57

**CERTIFICATE OF SERVICE**

I hereby certify that on ~~October 30, 2024~~January __, 2025, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:    */s/ Mark K. Gyandoh*
        Mark K. Gyandoh